**FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER**

**Electronically Filed
Intermediate Court of Appeals
CAAP-16-0000460
16-FEB-2021
07:47 AM
Dkt. 54 OP**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
CYRINA HEWITT, Defendant-Appellant


NO. CAAP-16-0000460


APPEAL FROM THE DISTRICT COURT OF THE THIRD CIRCUIT
KONA DIVISION
(CASE NUMBER 3DTA-15-00745)


FEBRUARY 16, 2021


GINOZA, CHIEF JUDGE, LEONARD AND HIRAOKA, JJ.


OPINION OF THE COURT BY HIRAOKA, J.

After a bench trial, Defendant-Appellant Cyrina Hewitt (**Hewitt**) was convicted of operating a vehicle under the influence of an intoxicant (**OVUII**) in violation of Hawaii Revised Statutes (**HRS**) § 291E-61(a)(1),[1] and driving without a license in

---

[1]     HRS § 291E-61 (2007) provides, in relevant part:

(a)   A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:

(1)    While under the influence of alcohol in an

(continued...)

violation of HRS § 286-102(b).[2]  Hewitt appeals from the "Judgment and Notice of Entry of Judgment" (**Judgment**) entered by the District Court of the Third Circuit, Kona Division,[3] on May 20, 2016.  She contends that the district court erred by **(1)** denying her motion to suppress her statement to a police officer that she was driving and failing to determine the voluntariness of her statement; **(2)** denying her motion to suppress the result of her warrantless blood draw; and **(3)** admitting her blood test result into evidence.

We hold that the district court did not err by denying Hewitt's motion to suppress her statement, but did err by overruling Hewitt's HRS § 621-26 trial objection and failing to conduct a hearing on the voluntariness of her statement.  In addition, the district court erred by denying Hewitt's motion to suppress her blood test result because the State did not develop the record to justify the warrantless blood draw.  Accordingly, we vacate the Judgment and remand for a new trial; we need not decide Hewitt's third point of error.

## BACKGROUND

At 1:00 a.m. on July 3, 2014, Hawai'i County Police

---

[1]  (...continued)
        amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty[.]

[2]  HRS § 286-102 (Supp. 2013) provides, in relevant part:

    (b)   A person operating the following category or combination of categories of motor vehicles shall be examined as provided in section 286-108 and duly licensed by the examiner of drivers:

    . . . .

    (3)   Passenger cars of any gross vehicle weight rating, buses designed to transport fifteen or fewer occupants, and trucks and vans having a gross vehicle weight rating of eighteen thousand pounds or less[.]

[3]  The Honorable Margaret K. Masunaga presided.

Department (**HCPD**) police officer Chandler Nacino was assigned to contact a possible assault victim at the Kona Community Hospital emergency room. The possible victim was Hewitt. Hospital staff told Officer Nacino that Hewitt had been dropped off at the emergency room by an unknown male. The male was not present when Officer Nacino made contact with Hewitt. A nurse was present, but left the room as Officer Nacino entered. HCPD police officer Kaea Sugata was also present in the emergency room, but Officer Nacino "did the majority of the talking[.]"

Hewitt was lying in a hospital bed, awake, and wearing a medical gown. She appeared to be disoriented. Neither Officer Nacino nor Officer Sugata remembered whether Hewitt was hooked up to an intravenous line. Hewitt had large contusions on her face. Her eyes were swollen shut. She had a laceration on her ear. She gave Officer Nacino her name and date of birth. She did not know where she was, and did not know why she was in the hospital. Officer Nacino then served her with "legal documents" for "an unrelated case[,]" for which she had to sign.[4]

Officer Nacino testified that when he asked Hewitt if she had been assaulted, "She gave me incoherent answers like, you know, that she's a big girl, she can handle her stuff, and kinda undecipherable, really, what she was saying." Officer Nacino observed that Hewitt "appeared to be out of it and had slurred speech."

Officer Nacino asked Hewitt why her eyes were swollen. Hewitt said she had pink eye, and later said she had stye eye. Officer Nacino did not think her injuries were consistent with either medical condition. Officer Nacino suspected that Hewitt was under the influence of alcohol or some kind of intoxicant, but he did not testify whether he knew if Hewitt had been given any medication in the emergency room that might have affected her level of consciousness.

---

[4] The record does not show what the document was, to what case it pertained, or why Officer Nacino had possession of the document at the time he was assigned to investigate an unidentified potential assault victim.

At that time, some paramedics walked by and asked what was happening.  Officer Nacino told the paramedics he was investigating whether Hewitt was an assault victim.  The paramedics told Officer Nacino they had seen a pickup truck in the bushes near the intersection of Queen Kaʻahumanu Highway and Kuakini Highway.  The paramedics gave Officer Nacino the truck's license plate number.

Officer Nacino left Hewitt in the emergency room, contacted his sergeant, Mekia Rose, and relayed the information provided by the paramedics.  Sergeant Rose went to the location described by the paramedics and found a pickup truck in the bushes.  The truck had front-end damage and both front airbags had been deployed. Sergeant Rose told Officer Nacino that the registered owner of the truck was named Cyrus Hewitt, and that Cyrina Hewitt's state identification card was found in a wallet inside the truck.  Sergeant Rose took a photograph of Hewitt's identification card and sent it to Officer Nacino in a text message.

Officer Nacino returned to Hewitt in the emergency room.  Up to that time, Officer Nacino had not placed Hewitt under arrest or told her she was not free to terminate their conversation.  Officer Nacino told Hewitt the pickup truck had been found.  He asked Hewitt if she was driving.  Hewitt stated that she was driving to a friend's house and parked the truck in the bushes.  She then stated she was going to the doctor. Officer Nacino stopped asking questions, placed Hewitt under arrest for OVUII, told her a blood draw would be conducted, and told her she would be released after her blood was drawn. Hewitt's blood was drawn at around 3:30 a.m.

## PROCEDURAL HISTORY

Hewitt was charged by complaint with OVUII and driving without a license.  She filed motions to suppress her statement that she was driving and evidence of her blood alcohol concentration.  Both motions were denied.  At trial, Officer

Nacino testified that Hewitt told him she was driving. Hewitt's father, Cyrus Hewitt, testified that a friend of his named Bill Thomas was the driver. Hewitt testified that "Uncle Bill" was driving, she fell asleep in the passenger seat, and woke up in the hospital. Hewitt was convicted of OVUII and driving without a license; when announcing the verdict, the district court stated it "heard the testimony of Mr. Cyrus Hewitt and defendant, Cyrina Hewitt, and does not find their testimonies to be credible." This appeal followed.

## STANDARD OF REVIEW

A trial court's ruling on a motion to suppress is reviewed de novo to determine whether the ruling was right or wrong. State v. Vinuya, 96 Hawaiʻi 472, 480, 32 P.3d 116, 124 (App. 2001).

> [W]hen the defendant's pretrial motion to suppress is denied and the evidence is subsequently introduced at trial, the defendant's appeal of the denial of the motion to suppress is actually an appeal of the introduction of the evidence at trial. Consequently, when deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial.

Id. at 481, 32 P.3d at 125 (cleaned up).

## DISCUSSION

1. **The district court did not err by denying Hewitt's motions to suppress, but erred when it overruled her trial objection.**

   A. **Motions to suppress.**

Hewitt's motions to suppress argued that she was interrogated by Officer Nacino while in custody without being advised of her Miranda rights.[5] A person in police custody may not be subjected to interrogation without first being advised of their Miranda rights. State v. Melemai, 64 Haw. 479, 481, 643

---

[5]    See Miranda v. Arizona, 384 U.S. 436 (1966).

P.2d 541, 543 (1982). But the Hawai'i Supreme Court has also noted that "application of the <u>Miranda</u> rule is limited." <u>Id.</u> at 481, 643 P.2d at 544. "It does not preclude the police, in the exercise of their investigatory duties or functions, from making general on-the-scene inquiries as to facts surrounding a crime or other general questions in the fact-finding process." <u>Id.</u> at 481-82, 643 P.2d at 544 (citation omitted).

In <u>Melemai</u>, a jogger was struck by a pickup truck. Eyewitnesses gave a police officer the license number and a description of the truck, which contained two occupants. The officer radioed the license number to the police station and obtained Melemai's name and address. The officer went to Melemai's address and waited. A truck arrived, driven by Melemai. It matched the description given by the witnesses, and contained one other occupant. At the officer's request, Melemai came out of the truck and produced his driver's license. The officer asked Melemai if he had hit anyone with his truck. Melemai answered affirmatively. The officer then asked Melemai why he ran away. Melemai responded that he got angry when he saw the jogger and "went for him." <u>Melemai</u>, 64 Haw. at 480, 643 P.2d at 543. Both questions were asked before Melemai was given <u>Miranda</u> warnings.

Melemai was indicted. He filed a motion to suppress the statements he made to the police officer and a motion to dismiss the indictment. The trial court granted both motions, ruling that <u>Miranda</u> warnings were required before the police officer could question Melemai. The State appealed. The Hawai'i Supreme Court reversed in part. The supreme court held that the determination of whether a defendant was in custody "is to be made by objectively appraising the totality of the circumstances[,]" including

> the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances. Among the relevant circumstances to be considered are whether the investigation has focused on the suspect and

> whether the police have probable cause to arrest [the suspect] prior to questioning. While focus of the investigation upon the defendant, standing alone, will not trigger the application of the Miranda rule, it is an important factor in determining whether the defendant was subjected to custodial interrogation. Probable cause to arrest is also not determinative, but it may play a significant role in the application of the Miranda rule.

Melemai, 64 Haw. at 481, 643 P.2d at 544 (citations omitted). The supreme court described "the outer parameters beyond which on-the-scene interviews may not proceed without Miranda warnings":

> Persons temporarily detained for brief questioning by police officers who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive[.]

Id. at 482, 643 P.2d at 544 (cleaned up). The court ultimately held:

> In the instant case, the officer knew that the jogger had been struck by a pickup truck with two occupants and also knew the vehicle's license number and its description. After obtaining the name and address of defendant, who was the vehicle's registered owner, the officer proceeded to defendant's address, and he waited for the defendant. Upon defendant's arrival, the officer noticed that the truck met the description given to him and was occupied by two persons. On the basis of the officer's knowledge and observation, we conclude that the investigation had focused upon the defendant, and that, **after defendant admitted his participation in the accident**, the police had probable cause to arrest.
>
> Inasmuch as the totality of circumstances created the kind of coercive atmosphere that Miranda warnings were designed to prevent, custody attached and Miranda warnings were required. Based upon our analysis, **defendant's answer to the _first_ question [if he had hit anyone with his car] _was_ admissible while** his answer to **the _second_ [why he ran away] was _not_**.

Id. (emphasis added) (footnote omitted).

In this case, Officer Nacino initially interviewed Hewitt as a potential assault victim. Hewitt argues that she was not free to leave the hospital emergency room while being questioned by Officer Nacino because she was physically

incapacitated and heavily sedated.  Her inability to leave was not the result of being detained by Officer Nacino or any other law enforcement authority.  Cf. State v. Kazanas, 138 Hawai‘i 23, 375 P.3d 1261 (2016) (police officer asking defendant how his Halloween went, while defendant was under arrest and being transported to hospital, constituted custodial interrogation); and State v. Pebria, 85 Hawai‘i 171, 174-75, 938 P.2d 1190, 1193-94 (App. 1997) (holding that defendant's statement to police officer, in response to question if defendant knew why he was being detained by hospital security guards, that "I [wen'] grab the girl[,]" was result of custodial interrogation).

Even after Officer Nacino received information that Hewitt's identification had been found in a pickup truck that had apparently been involved in an accident, he did not have probable cause to arrest Hewitt for OVUII.  Hewitt was not seen in the driver's seat, and her injuries could have been caused when the front-passenger-seat airbag deployed.  We hold that Hewitt was not in custody when Officer Nacino asked her if she was driving. Once Hewitt said she was driving the pickup truck, Officer Nacino appropriately stopped asking Hewitt questions.  Because Hewitt was not in custody while she was being questioned by Officer Nacino, we need not decide whether Officer Nacino's questions "were reasonably likely to elicit an incriminating response from the person in custody."  Kazanas, 138 Hawai‘i at 26, 375 P.3d at 1264 (citation omitted).

Hewitt argues that Officers Nacino and Sugata interrogated her for almost three hours.  Hewitt admittedly did not remember speaking to either officer.  All of the evidence in the record indicates that Officer Nacino initially questioned Hewitt to determine whether she was the victim of an assault. After the paramedics mentioned seeing a pickup truck in the bushes, Officer Nacino left the emergency room to follow up with Sergeant Rose.  It was only after Sergeant Rose texted Hewitt's identification card to Officer Nacino that he returned to the emergency room to ask if Hewitt was driving.  The record does not

establish that Hewitt was subjected to "sustained and coercive" questioning by Officer Nacino.  Melemai, 64 Haw. at 482, 643 P.2d at 544.  Given this record, the district court did not err by denying Hewitt's motion to suppress.  See also State v. Kaleohano, 99 Hawaiʻi 370, 377, 56 P.3d 138, 145 (2002) ("[I]f neither probable cause to arrest nor sustained and coercive interrogation are present, then questions posed by the police do not rise to the level of 'custodial interrogation' requiring Miranda warnings.") (quoting State v. Ah Loo, 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000)).

### B.    Trial objection.

Hewitt did not cite HRS § 621-26 in her motion to suppress or during the hearing on the motion.  The statute provides:

> No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made.

HRS § 621-26 (1993).  At trial, after Officer Nacino testified he asked Hewitt whether she had been in a traffic accident, the State asked "what was her response?"  Defense counsel objected, citing HRS § 621-26.  The district court overruled the objection.  Officer Nacino then testified: "She informed me that she was driving the vehicle and had parked it there[ in the bushes]."

Rather than overruling the objection, the district court should have conducted an evidentiary hearing to determine whether Hewitt's statement was voluntarily made, in light of the evidence that Hewitt had sustained significant head trauma, did not know where she was, and was incoherent.  Although Hewitt's statement to Officer Nacino was not a confession of OVUII, HRS § 621-26 applies to inculpatory statements as well as confessions.  See State v. Kelekolio, 74 Haw. 479, 501 n.13, 849 P.2d 58, 69 n.13 (1993) ("we perceive no meaningful distinction between a 'confession' and 'inculpatory statements' for purposes

of the right against self-incrimination.")  The district court erred by not conducting an evidentiary hearing to determine whether Hewitt's inculpatory statement was voluntarily made.

> ### 2. The district court erred by denying Hewitt's motion to suppress her blood test result.

The State argued that Hewitt's motion to suppress evidence of the alcohol content of her blood was not timely filed under Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 12(c).  The district court recognized the issue, but proceeded to rule on the merits.  The district court had discretion to so proceed, and the denial of the motion on its merits is properly before us.  See State v. Przeradski, 5 Haw. App. 29, 32, 677 P.2d 471, 474-75 (1984) (noting that HRPP Rule 12(f) gives the trial court discretion to rule on an untimely pretrial motion).

Hewitt contends that the district court should have suppressed evidence of her blood alcohol content because it was the result of a warrantless search and seizure in violation of her constitutional rights.  She acknowledges that the blood draw was performed pursuant to HRS § 291E-21(a) (2007), which authorizes a law enforcement officer to obtain a sample of blood "from the operator of any vehicle involved in a collision resulting in injury to . . . any person, as evidence that the operator was under the influence of an intoxicant."

> A warrantless [blood alcohol concentration] test . . . pursuant to HRS § 291E-21 . . . does not offend the Hawaiʻi Constitution "so long as (1) the police have probable cause to believe that the person has committed a DUI offense and that the blood sample will evidence that offense, (2) *exigent circumstances are present*, and (3) the sample is obtained in a reasonable manner."

State v. Won, 137 Hawaiʻi 330, 344 n.26, 372 P.3d 1065, 1079 n.26 (2015) (emphasis added) (quoting State v. Entrekin, 98 Hawaiʻi 221, 232, 47 P.3d 336, 347 (2002)).

In Entrekin, the Hawaiʻi Supreme Court discussed Schmerber v. California, 384 U.S. 757 (1966), where the United

States Supreme Court held that the fourth amendment to the
Constitution does not prohibit a nonconsensual, warrantless blood
extraction from a person suspected of driving under the influence
of drugs or alcohol (**DUI**) if: "(1) the police have probable cause
to believe that the person is DUI; (2) exigent circumstances are
present under which the delay necessary to obtain a warrant would
result in the loss of evidence; and (3) the procedures employed
to extract the blood are reasonable."  Entrekin, 98 Hawai'i at
231, 47 P.3d at 346.  The Hawai'i Supreme Court then held:

> The exigent circumstances exception is present when the
> demands of the occasion reasonably call for an immediate
> police response.  More specifically, it includes situations
> presenting an immediate threatened removal or destruction of
> evidence.  However, the burden, of course, is upon the
> government to prove the justification, and whether the
> requisite conditions exists [sic] is to be measured from the
> totality of the circumstances.  And in seeking to meet this
> burden, the police must be able to point to specific and
> articulable facts from which it may be determined that the
> action they took was necessitated by the exigencies of the
> situation.
>
> . . . .
>
> . . . ***[E]xigent circumstances were clearly present***.
> It is undisputed that the percentage of alcohol in the blood
> begins to diminish shortly after drinking stops, as the body
> functions to eliminate it from the system. [T]he arrested
> person's blood-alcohol level by its very nature dissipates
> and is forever lost as time passes, and any alcohol ingested
> by the arrested person is digested and its effects on the
> body pass[.]

Id. at 232-33, 47 P.3d at 347-48 (cleaned up) (emphasis added).

In this case the district court relied upon Schmerber
in denying Hewitt's motion to suppress.  But in Missouri v.
McNeely, 569 U.S. 141 (2013) (decided after Entrekin), the United
States Supreme Court held "that in drunk-driving investigations,
the natural dissipation of alcohol in the bloodstream does not
constitute an exigency in every case sufficient to justify
conducting a blood test without a warrant."  Id. at 165.  The
Supreme Court reasoned:

> It is true that as a result of the human body's
> natural metabolic processes, the alcohol level in a person's
> blood begins to dissipate once the alcohol is fully absorbed

and continues to decline until the alcohol is eliminated. . . . Regardless of the exact elimination rate, it is sufficient for our purposes to note that because an individual's alcohol level gradually declines soon after [the person] stops drinking, a significant delay in testing will negatively affect the probative value of the results. This fact was essential to our holding in Schmerber, as we recognized that, under the circumstances, further delay in order to secure a warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence.

But it does not follow that we should depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State and its amici. In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in Schmerber, not to accept the "considerable overgeneralization" that a per se rule would reflect.

The context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a "'now or never'" situation. In contrast to, for example, circumstances in which the suspect has control over easily disposable evidence, [blood alcohol concentration] evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner. . . .

The State's proposed per se rule also fails to account for advances in the 47 years since Schmerber was decided that allow for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple. The Federal Rules of Criminal Procedure were amended in 1977 to permit federal magistrate judges to issue a warrant based on sworn testimony communicated by telephone. As amended, the law now allows a federal magistrate judge to consider "information communicated by telephone or other reliable electronic means." Fed. Rule Crim. Proc. 4.1. States have also innovated. Well over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing.

Id. at 152-54 (cleaned up) (citing, among other states' court rules, Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 41(h)-(i) (2013)[6]).

We cited McNeely in State v. Niceloti-Velazquez, 139 Hawaiʻi 203, 386 P.3d 487 (App. 2016), in which we held:

> In the case before this court, the record does not support a finding that, given the totality of the circumstances, the police officers could not have reasonably obtained a search warrant before drawing Velazquez's blood sample. Because ***the district court only cited the risk of blood alcohol dissipation to support its finding of exigency*** and because the prosecution failed to adequately develop the record to demonstrate that the police officers were justified to act without a warrant, the district court clearly erred in holding that exigent circumstances existed to justify the warrantless extraction of Velazquez's blood sample.

Niceloti-Velazquez, 139 Hawaiʻi at 205, 386 P.3d at 489 (emphasis added) (citation omitted).

---

[6] HRPP Rule 41 has not been amended since it was cited in McNeely. It provides, in relevant part:

**Rule 41. SEARCH AND SEIZURE.**

. . . .

**(c) Issuance and contents.** A warrant shall issue only on an affidavit or affidavits sworn to before the judge and establishing the grounds for issuing the warrant. . . .

. . . .

**(h) Warrant issuance on oral statements.** In lieu of the written affidavit required under section (c) of this rule, a sworn oral statement, in person or by telephone, may be received by the judge, which statement shall be recorded and transcribed, and such sworn oral statement shall be deemed to be an affidavit for the purposes of this rule. Alternatively to receipt by the judge of the sworn oral statement, such statement may be recorded by a court reporter who shall transcribe the same and certify the transcription. In either case, the recording and the transcribed statement shall be filed with the clerk.

**(i) Duplicate warrants on oral authorization.** The judge may orally authorize a police officer to sign the signature of the judge on a duplicate original warrant, which shall be deemed to be a valid search warrant for the purposes of this rule. The judge shall enter on the face of the original warrant the exact time of issuance and shall sign and file the original warrant and, upon its return, the duplicate original warrant with the clerk.

The facts of this case illustrate why more than just "the risk of blood alcohol dissipation" should be required to justify a warrantless blood draw. Officer Nacino testified:

> Q. Okay. And can you just tell us what you based, uh, the breath or why you conducted that blood draw? What information did you base it on?
>
> A. Um, slurred speech. She seemed to be completely out of it, unaware of her surroundings.
>
> Q. Uh-huh.
>
> A. And the fact that she had been in a traffic accident that involved injuries.

On cross-examination, Officer Nacino was asked:

> Q. Okay.
>
> Now it wasn't until she had made the statement that "I had been driving the truck" that you informed her that she would be arrested for suspicion of a DUI, correct?
>
> A. Yes, sir.

State's Exhibit 11, admitted into evidence at trial without objection, was Officer Nacino's sworn statement of probable cause for Hewitt's arrest. Officer Nacino stated:

> [Hewitt] stated she was the operator of [the truck]. [Hewitt] had slow speech, when asked question[s] [Hewitt] would go off topic and ramble on about things unrelated to [the] question. [Hewitt] appeared to be disoriented and was unaware of injuries sustained from traffic casualty. This lead [sic] me to believe [Hewitt] was under the influence of drugs and or alcohol.

Officer Nacino did not testify that he detected an odor similar to that of an alcoholic beverage on Hewitt's breath or body. There was no evidence that empty or open containers of liquor, or a bar or restaurant tab or other receipt evidencing the recent consumption of alcohol, were found in the cab of Cyrus Hewitt's truck, or with Cyrina Hewitt's identification card. Hewitt's apparent disorientation could have been explained by a concussion (as evidenced by Hewitt's significant head trauma). Although she

knew who she was, she did not know where she was.  There was no evidence that Officer Nacino attempted to determine if Hewitt was oriented to time (as one would to attempt to diagnose or rule out a concussion).  Hewitt's disorientation could also have been the result of prescription medication administered to her in the hospital emergency room.  Under the totality of these circumstances, it would not have been unreasonable for a judge to require more information before issuing a warrant for a blood draw.  There was no evidence that Officer Nacino, Officer Sugata, Sergeant Rose, or any other police officer attempted to contact a judge to obtain a warrant before requesting the blood draw.  We hold that the State failed to adequately develop the record to demonstrate the existence of exigent circumstances that would have justified Officer Nacino requesting a warrantless blood draw.  The district court erred in denying Hewitt's motion to suppress the blood test results.

## CONCLUSION

Based upon the foregoing, the "Judgment and Notice of Entry of Judgment" entered by the district court on May 20, 2016, is vacated.  This case is remanded for a new trial consistent with this opinion.

On the briefs:

Charles E. Murray III,
Deputy Prosecuting Attorney,
State of Hawaiʻi,
for Plaintiff-Appellee.

Taryn R. Tomasa,
Deputy Public Defender,
State of Hawaiʻi,
for Defendant-Appellant.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge