**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000814
22-OCT-2021
09:30 AM
Dkt. 89 SO**

NO. CAAP-19-0000814

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellee, v.
MYISHA LEE ARMITAGE, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CPC-17-0000342)

SUMMARY DISPOSITION ORDER
(By: Leonard, Presiding Judge, Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Myisha Lee Armitage (**Armitage**) appeals from the Judgment of Conviction and Sentence, entered on November 1, 2019, in the Circuit Court of the First Circuit (**Circuit Court**).[1] Following a jury trial, Armitage was convicted of Accidents Involving Death or Serious Bodily Injury, in violation of Hawaii Revised Statutes (**HRS**) § 291C-12 (Supp. 2015)[2] (**Count 1**), and Negligent Homicide in the First Degree, in violation of HRS §§ 707-702.5(1)(a) and/or 707-702.5(1)(b)

---

[1] The Honorable Paul B.K. Wong presided.

[2] At the time of the alleged offense, HRS § 291C-12 provided, in relevant part:

> **Accidents involving death or serious bodily injury.**
> (a) The driver of any vehicle involved in an accident resulting in serious bodily injury to or death of any person shall immediately stop the vehicle at the scene of the accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until the driver has fulfilled the requirements of section 291C-14. Every such stop shall be made without obstructing traffic more than is necessary.

(2014)[3/] (**Count 2**).

On appeal, Armitage contends that: (1) the indictment as to Count 1 was insufficient because it failed to specify that Armitage did not stop as close as possible to the accident scene and "forthwith return" to the scene "without obstructing traffic more than is necessary," HRS § 291C-12; (2) the jury instructions for Count 1 were prejudicially insufficient, erroneous, and misleading because they did not contain all of the elements of the charged offense; (3) there was insufficient evidence to sustain the conviction as to Count 1; (4) the indictment as to Count 2 was insufficient because it did not include the definition of "under the influence" and thus failed to state an offense; and (5) the Circuit Court erred in not suppressing the result of Armitage's blood alcohol test where the police failed to obtain a warrant to draw Armitage's blood.

After reviewing the record on appeal and the relevant legal authorities, and giving due consideration to the issues raised and the arguments advanced by the parties, we resolve Armitage's contentions as follows:

(1) Armitage argues that the Hawaiʻi Supreme Court's decision in State v. Baker, 146 Hawaiʻi 299, 463 P.3d 956 (2020), is dispositive of her contention that the indictment was insufficient as to Count 1.

In Baker, the supreme court considered the sufficiency of a charge brought against a driver for failure to stop at the scene of an accident involving vehicle damage, in violation of HRS § 291C-13. At that time, HRS § 291C-13 (Supp. 2008) stated, in relevant part:

---

[3/]     HRS § 707-702.5 states, in relevant part:

>     **Negligent homicide in the first degree.** (1) A person commits the offense of negligent homicide in the first degree if that person causes the death of:
>
>     (a)     Another person by the operation of a vehicle in a negligent manner while under the influence of drugs or alcohol; or
>
>     (b)     A vulnerable user by the operation of a vehicle in a negligent manner.

> **Accidents involving damage to vehicle or property**.
> The driver of any vehicle involved in an accident resulting
> only in damage to a vehicle or other property that is driven
> or attended by any person shall immediately stop such
> vehicle at the scene of the accident or as close thereto as
> possible, but shall forthwith return to, and in every event
> shall remain at, the scene of the accident until the driver
> has fulfilled the requirements of section 291C-14. Every
> such stop shall be made without obstructing traffic more
> than is necessary. . . .

See Baker, 146 Hawaiʻi at 302 n.1, 463 P.3d 959 n.1.

The supreme court construed this language to mean that "[a] driver . . . . does not violate the statute by not stopping at the scene, by not stopping as close as 'possible' to the scene, or not returning to the scene of the accident, if doing so would prevent a traffic hazard that would otherwise result." Id. at 307, 463 P.3d at 964. Therefore, the court concluded:

> The requirement that the stop was made without obstructing
> traffic more than is necessary is thus a requisite aspect of
> proof of the offense when the driver stops at, or forthwith
> returns to, a location that the State contends is not as
> close as "possible" to the accident scene.
>
> Accordingly, when a defendant stops in close proximity
> of the accident scene and provides the requisite
> information, the State, in order to show a violation of the
> statute, is required to prove the following: (1) the
> defendant failed to stop at a location that was as close to
> the scene of the accident as possible, or to forthwith
> return thereto, and (2) the failure did not result from the
> defendant avoiding an unnecessary obstruction of traffic.

Id.

In Baker, the defendant challenged the sufficiency of the failure-to-stop charge for the first time on appeal. Id. at 308, 463 P.3d at 965. The supreme court thus applied the liberal construction standard in reviewing the charge. Id. (citing State v. Motta, 66 Haw. 89, 90, 657 P.2d 1019, 1019-20 (1983); State v. Wells, 78 Hawaiʻi 373, 381, 894 P.2d 70, 78 (1995)). The court nevertheless ruled:

> The State in this case did not specify in the complaint that
> [the defendant] did not stop either at the accident scene or
> stop at the location closest to the accident scene and
> forthwith return thereto without obstructing traffic more
> than is necessary. The State's omission of this statutory
> qualification did not provide [the defendant] with fair
> notice of the elements of the offense charged. In fact, the
> charge did not include any reference to the language
> "without obstructing traffic more than is necessary" or
> include language similar to it. The failure to include the
> statutory language resulted in this element of the charge

3

> having a common meaning that differed from the express statutory requirements, and thus neither the complaint nor the oral charge can be reasonably construed to charge an offense. Accordingly, the deficient charge deprived Baker of the right to due process. As a result, the State failed to state an offense, and the conviction based upon it cannot be sustained.

Baker, 146 Hawaiʻi at 308, 463 P.3d at 965 (citations omitted).

Here, Armitage was charged in Count 1 with failing to stop at the scene of an accident involving death or serious bodily injury, in violation of HRS § 291C-12. The operative provisions of HRS § 291C-13 substantially mirror those of HRS § 291C-12. In particular, both statutes require a driver who is involved in an accident that causes a specified harm to immediately stop at the scene of the accident or stop "as close thereto as possible" and "forthwith return" to the scene. HRS § 291C-12; HRS § 291C-13; see Baker, 146 Hawaiʻi at 306, 463 P.3d at 963. Both statutes also require that "[e]very such stop shall be made without obstructing traffic more than is necessary." HRS § 291C-12; HRS § 291C-13. However, the charge against Armitage, like its counterpart in Baker, failed to specify that Armitage did not stop at the accident scene or stop at the location closest to the accident scene and forthwith return thereto without obstructing traffic more than is necessary. Under Baker, the failure to include the statutory language "without obstructing traffic more than is necessary," or similar language, rendered Count 1 deficient and deprived Armitage of the right to due process. See Baker, 146 Hawaiʻi at 308, 463 P.3d at 965.

The State contends that because Baker was decided after Armitage's trial, the Baker ruling "should be given purely prospective effect" and should not be applied in this case. However, the supreme court in Baker did not indicate that its ruling on the sufficiency of the charge should be given strictly prospective effect; rather, the court applied its ruling to the case before it, concluding that the State failed to state an offense and vacating the defendant's conviction under HRS § 291C-13.[4] See id. at 308, 310, 463 P.3d at 965, 967. The disposition

---

[4] The court further concluded that the evidence was insufficient to convict Baker under HRS § 291C-13, and thus remanded the case to the district court with instructions to enter a judgment of acquittal. See Baker, 146

of Baker thus indicates that the court's ruling on the sufficiency of the charge was not intended to apply "purely prospectively." Cf. State v. Jones, 148 Hawaiʻi 152, 174-76, 468 P.3d 166, 188-90 (2020) (applying a holding prospectively and not to the case at bar); State v. Torres, 144 Hawaiʻi 282, 292-95, 439 P.3d 234, 244-47 (2019) (same); State v. Jess, 117 Hawaiʻi 381, 404, 184 P.3d 133, 156 (same). At least as to the present case, which is on direct appellate review, we conclude that the Baker ruling – *i.e.*, that the failure-to-stop charge was deficient for omitting the statutory language "without obstructing traffic more than is necessary," or similar language – applies. For the reasons discussed above, the Judgment as to Count 1 must be vacated.

(2) Given that we vacate as to Count 1 based on Armitage's first point of error, we do not reach her second point of error.

(3) In her third point of error, Armitage contends there was insufficient evidence to support her conviction as to Count 1.

Sufficient evidence to support a conviction "requires substantial evidence as to every material element of the offense charged." State v. Grace, 107 Hawaiʻi 133, 139, 111 P.3d 28, 34 (App. 2005) (quoting State v. Ferrer, 95 Hawaiʻi 409, 422, 23 P.3d 744, 757 (App. 2001)). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (quoting Ferrer, 95 Hawaiʻi at 422, 23 P.3d at 757). The evidence must be "viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact," who must "determine credibility, weigh the evidence, and draw justifiable inferences of fact." Id. (quoting Ferrer, 95 Hawaiʻi at 422, 23 P.3d at 757).

In order to convict Armitage for a violation of HRS § 291C-12, the State was required to prove beyond a reasonable doubt that: (1) Armitage was driving a vehicle that was involved

---

Hawaiʻi at 310, 463 P.3d at 967.

in an accident resulting in serious bodily injury to or death of another person; and (2) Armitage did not (a) immediately stop at the scene or stop as close thereto as possible and forthwith return to the scene without obstructing traffic more than is necessary; or (b) give the information required by HRS § 291C-14[5/] to any person injured in the accident and any police officer at the scene, and render to any person injured in the accident reasonable assistance.  See HRS § 291C-12; HRS § 291C-14; see also Baker, 146 Hawaiʻi at 309, 463 P.3d at 966 (stating the elements to prove a violation of HRS § 291C-13).  In the event that any person injured was not in condition to receive the required information, and no police officer was present, the State was required to prove that Armitage did not forthwith report the accident to the nearest police officer and provide the required information after fulfilling other statutory requirements insofar as possible.  See HRS § 291C-14(b); see also Baker, 146 Hawaiʻi at 309, 463 P.3d at 966.  The State was also required to prove that Armitage committed each element of the

---

[5/]     At the time of the alleged offense, HRS § 291C-14 (Supp. 2015) provided, in relevant part:

> (a) The driver of any vehicle involved in an accident resulting in injury to or death of any person or damage to any vehicle or other property which is driven or attended by any person shall give the driver's name, address, and the registration number of the vehicle the driver is driving, and shall upon request and if available exhibit the driver's license or permit to drive to any person injured in the accident or to the driver or occupant of or person attending any vehicle or other property damaged in the accident and shall give such information and upon request exhibit such license or permit to any police officer at the scene of the accident or who is investigating the accident and shall render to any person injured in the accident reasonable assistance, including the carrying, or the making of arrangements for the carrying, of the person to a physician, surgeon, or hospital for medical or surgical treatment if it is apparent that such treatment is necessary, or if such carrying is requested by the injured person . . . .

> (b) In the event that none of the persons specified is in condition to receive the information to which they otherwise would be entitled under subsection (a), and no police officer is present, the driver of any vehicle involved in the accident after fulfilling all other requirements of section 291C-12, 291C-12.5, or 291C-12.6, and subsection (a) of this subsection, insofar as possible on the driver's part to be performed, shall forthwith report the accident to the nearest police officer and submit thereto the information specified in subsection (a).

offense intentionally, knowingly, or recklessly. See HRS §§ 291C-12, 701-114, 702-204.

Armitage argues there was insufficient evidence to convict her on Count 1 because she satisfied the requirements of HRS § 291C-14 by providing her driver's license and other information requested by the police officers who responded to Armitage's location following the accident. In making this argument, however, Armitage ignores the substantial evidence indicating that she did not give the information required by HRS § 291C-14 to any police officer at the scene of the accident, but, rather, continued to drive for nearly a mile after hitting Kaulana Werner (**Kaulana**) and only stopped when her vehicle stalled. Armitage also ignores the related substantial evidence that she did not immediately stop at the accident scene or stop as close thereto as possible and forthwith return to the scene without obstructing traffic more than is necessary.

At trial, Honolulu Police Department (**HPD**) Sergeant Philip White (**Sgt. White**) testified to the following: At 8:35 p.m. the evening of the incident, Sgt. White responded to a dispatch call for a pedestrian motor vehicle collision in the area of Pohakunui Avenue and Farrington Highway. As Sgt. White passed the Kahe Power Plant, he noticed individuals jumping up and down and waving their arms, directing his attention to a BMW sedan that he later determined was driven by Armitage, and an SUV that he later determined was driven by Joshua Wakinekona (**Wakinekona**), on the makai shoulder of the eastbound side of Farrington Highway. Sgt. White first observed Armitage standing outside of her vehicle, and she indicated that she was the driver.

Sgt. White's testimony continued as follows:

> Q. [DPA:] What . . ., if anything, happened next?
>
> A. [Sgt. White:] I asked her what happened.
>
> Q. And what did she say?
>
> A. She said, really excited, "I don't know. I don't know. I hit something. I don't know."
>
> Q. What did you do at that point?
>
> A. I asked her for her name.

Q. Okay. And she replied, she responded to you?

A. She provided me with her first and last name.

Sgt. White next asked Armitage for her driver's license and vehicle documents, which Armitage provided. After this exchange, Sgt. White examined Armitage's vehicle, observed extensive damage to it, and determined that it was involved in the pedestrian motor vehicle collision. The location of Armitage's vehicle was approximately eight tenths of a mile east (*i.e.*, toward town) from the scene of the collision. According to Sgt. White, who travels on Farrington Highway every day as he goes to work, "there are numerous places to turn off" between the scene of the collision and where Armitage's vehicle was located.

Edward Werner (**Edward**), Kaulana's father, similarly testified that there were multiple places to turn off between the scene of the accident and where Armitage's car stopped. Specifically, Edward testified that there was no guard rail near the scene of the accident and there were "a lot of places" "to pull your car over." According to Edward, "You can just turn right on the side and pull onto that . . . grassy area." Edward also testified that a car could turn onto Piliokahi Street, a cross street "right there as well." Edward further testified that a car, traveling townbound along Farrington Highway, could turn into Black Rock Beach, which is located "about twenty houses down" from the scene of the accident. Edward testified that he was familiar with the area in question because he has "driven that roadway . . . [a]ll my life."

Waikinekoa testified in part as follows: On the evening of the incident, Waikinekoa and Armitage met in the parking lot across from the O'Reilly store and agreed to drive out to Tracks Beach Park. Wakinekona drove his Suburban SUV, and Armitage followed behind him in her own car. Wakinekona turned left onto Farrington Highway going toward town, driving "pretty quick," with Armitage behind him. At some point after going over the hill near Tracks Beach, Wakinekona did not see Armitage's headlights behind him any longer, so he "pulled off the road before the guard rail and [he] just sat there looking in [his] mirror," then saw "the projection of [Armitage's] lights . . .

8

coming up towards the top of the hill." Wakinekoa saw the lights flicker on and off, and "figured she stalled or blow holes and the car shut off, so [he] turned on [his] amber lights and . . . reversed back towards her." Armitage's car had stalled. Wakinekoa went to Armitage's car and asked, "what happened" and saw that her airbag had been deployed. Armitage responded, "I don't know." Wakinekoa shined a light on Armitage's vehicle and saw extensive damage, before Armitage said, "we need to get out of here." Wakinekoa described the following exchange with Armitage:

> Q. [by DPA] Who told you "we need to get out of here"?
>
> A. [Armitage.]
>
> Q. She said -- she said that to you?
>
> A. Yes.
>
> Q. Okay. What did you do then?
>
> A. I said -- I said no. I said, "I going -- I'll pull your car off the road." And I was going to go back and go see if something fell off the car or what happened. And she said, "No, you gotta get me outta here." And I asked, I said, "What happened?" She goes, "I don't know. Something jumped in the front of my car."

Upon review of the record, we conclude there was substantial evidence that Armitage drove a vehicle that was involved in an accident resulting in the death of another person, and Armitage did not immediately stop at the scene or stop as close thereto as possible and forthwith return to the scene without obstructing traffic more than was necessary. We further conclude there was substantial evidence that Armitage did not give the information required by HRS § 291C-14 to any police officer at the accident scene. Accordingly, on this record, the evidence was sufficient to support Armitage's conviction on Count 1.

(4) A person commits the offense of negligent homicide in the first degree if, *inter alia*, the person causes the death of another person by operating a vehicle in a negligent manner "while under the influence of drugs or alcohol[.]" HRS § 707-702.5(1)(a).

Armitage contends that the indictment as to Count 2 was

insufficient because it did not include the definition of "under the influence" and thus failed to state an offense.[6] The State agrees that the common understanding of the phrase "under the influence" "does not necessarily comport with the statutory definition" stated in HRS § 291E-1,[7] but argues that Armitage's challenge to the indictment must fail because she had actual notice of the definition prior to objecting to the sufficiency of the charge at issue.

In <u>State v. Mita</u>, 124 Hawaiʻi 385, 245 P.3d 458 (2010), the supreme court stated:

---

[6]    Count 2 of the indictment stated:

> COUNT 2: On or about April 24, 2016, in the City and County of Honolulu, State of Hawaiʻi, MYISHA LEE ARMITAGE did cause the death of Kaulana Werner by the operation of a vehicle in a negligent manner while under the influence of drugs or alcohol, and/or MYISHA LEE ARMITAGE did cause the death of Kaulana Werner, who was a vulnerable user, to wit, a person legally within a street or public highway, by the operation of a vehicle in a negligent manner, thereby committing the offense of Negligent Homicide in the First Degree, in violation of Section 707-702.5(1)(a) and/or Section 707-702.5(1)(b) of the Hawaiʻi Revised Statutes. In accordance with Section 264-1(a) of the Hawaiʻi Revised Statutes, "public highway" means all roads, alleys, streets, ways, lanes, bikeways, bridges, and all other real property highway related interests in the State, opened, laid out, subdivided, consolidated, and acquired and built by the government. In accordance with Section 291C-1 of the Hawaiʻi Revised Statutes, "street" means the entire width between boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purpose of vehicular travel.

[7]    HRS § 291E-1 (Supp. 2015) states:

"Under the influence" means that a person:

(1)   Is under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty;

(2)   Is under the influence of any drug that impairs the person's ability to operate the vehicle in a careful and prudent manner;

(3)   Has .08 or more grams of alcohol per two hundred ten liters of the person's breath; or

(4)   Has .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of the person's blood.

> Article I, section 14 of the Hawaiʻi Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation[.]" . . . "[T]he sufficiency of the charging instrument is measured, inter alia, by 'whether it contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he [or she] must be prepared to meet[.]'" . . . The relevant inquiry, therefore, is whether or not the charge provided the accused with fair notice of the essential elements.

Id. at 390, 245 P.3d at 463 (brackets in original) (quoting and citing State v. Wheeler, 121 Hawaiʻi 383, 391, 395, 219 P.3d 1170, 1178, 1182 (2009)).

We agree that the common understanding of the phrase "under the influence" does not necessarily comport with the statutory definition. However, in determining the sufficiency of a charge, "the appellate court can consider other information in addition to the charge that may have been provided to the defendant during the course of the case up until the time defendant objected to the sufficiency of the charges against him [or her]." Wheeler, 121 Hawaiʻi at 396, 219 P.3d at 1183; see State v. Treat, 67 Haw. 119, 120, 680 P.2d 250, 251 (1984) ("We think that in determining whether the accused's right to be informed of the nature and cause of the accusation against him has been violated, we must look to all of the information supplied to him by the State to the point where the court passes upon the contention that his right has been violated." (quoting State v. Robins, 66 Haw. 312, 317, 660 P.2d 39, 42-43 (1983))); see also State v. Salvas, No. CAAP-18-0000160, 2021 WL 1232051, at *11-12 (Haw. App. Mar. 31, 2021) (Mem.) (where the defendant first challenged the sufficiency of the charges toward the end of trial, after the State rested its case, this court considered information provided to the defendant before and during trial, prior to the challenge).

Here, Armitage first raised a challenge to Count 2 of the indictment during trial, at the close of evidence, in a motion for judgment of acquittal. However, on July 24, 2019, nearly a month before trial began, the State filed its proposed jury instructions, which included the statutory definition of "under the influence," as set forth in HRS § 291E-1. These proposed instructions gave Armitage ample notice of precisely

11

"what . . . she must be prepared to meet" at trial regarding the definition at issue.[8/]  Mita, 124 Hawaiʻi at 390, 245 P.3d at 463 (quoting Wheeler, 121 Hawaiʻi at 391, 219 P.3d at 1178) (brackets omitted); cf. State v. Israel, 78 Haw. 66, 72, 890 P.2d 303, 309 (1995) (ruling that the record was insufficient to show that the defendant had actual knowledge of the charge where, *inter alia*, "there have been no opening statements or jury instructions that could constitute objective indicia of [the defendant's] knowledge of the underlying felony that the State was alleging that he committed").  During trial, but prior to Armitage's motion for judgment of acquittal, the Circuit Court and the parties discussed the definition of "under the influence" that would be provided to the jury, and the Circuit Court informed the parties of the precise definition that would be given to the jury.

On this record, we conclude that Armitage was fully informed of the nature and cause of the accusation against her for negligent homicide in the first degree, including the statutory definition of "under the influence," before she brought her motion for judgment of acquittal.  We further conclude that the information provided by the State to Armitage prior to trial sufficiently apprised her of the charge she must be prepared to meet.  Examined in this context, the charge was sufficient.

(5) Armitage contends that the Circuit Court should have suppressed the result of her blood alcohol concentration test because it was the result of a warrantless blood draw on the night of the incident, in violation of her constitutional rights.  She argues that the Circuit Court erred in ruling that the blood draw was constitutionally permissible based on exigent circumstances.

In State v. Hewitt, 149 Hawaiʻi 71, 72, 481 P.3d 713, 714 (App. 2021), cert. granted, No. SCWC-16-0000460, 2021 WL 2775190 (Haw. July 2, 2021), this court held that the district court erred in denying the defendant's motion to suppress her

_____

[8/]    Armitage's motion to suppress statements and evidence, filed on January 5, 2018, a year and a half before trial, also indicates that she was aware that her alleged blood alcohol content was part of the State's case. Her motion stated in part:  "In the instant case, the State will likely argue that the police had probable cause to believe that the person has committed a DUI or other offense where a blood sample would evidence the offense . . . ."

blood test result because the State did not develop the record to justify her warrantless blood draw.  There, the defendant was in a hospital emergency room being questioned by a police officer as a potential assault victim when the officer received information about a damaged abandoned truck that contained the defendant's state identification card.  Id. at 73, 481 P.3d at 715. Suspecting that the defendant was under the influence of an intoxicant, the officer returned to the emergency room and asked the defendant whether she was the driver of the truck.  Id. Following the defendant's response, the officer placed her under arrest for operating a vehicle under the influence of an intoxicant (**OVUII**) and told her a blood draw would be conducted. Id.  The blood draw was performed pursuant to HRS § 291E-21(a) (2007), which authorizes a law enforcement officer to obtain a sample of blood "from the operator of any vehicle involved in a collision resulting in injury to . . . any person, as evidence that the operator was under the influence of an intoxicant."  Id. at 76, 481 P.3d at 718.

On appeal, the defendant argued that the district court should have suppressed evidence of her blood alcohol content because it was the result of a warrantless search and seizure in violation of her constitutional rights.  Id.  In analyzing the defendant's argument, this court stated:

> A warrantless [blood alcohol concentration] test . . . pursuant to HRS § 291E-21 . . . does not offend the Hawaiʻi Constitution "so long as (1) the police have probable cause to believe that the person has committed a DUI offense and that the blood sample will evidence that offense, (2) *exigent circumstances are present*, and (3) the sample is obtained in a reasonable manner."
>
> State v. Won, 137 Hawaiʻi 330, 344 n.26, 372 P.3d 1065, 1079 n.26 (2015) (emphasis added) (quoting State v. Entrekin, 98 Hawaiʻi 221, 232, 47 P.3d 336, 347 (2002)).
>
> In Entrekin, the Hawaiʻi Supreme Court . . . held:
>
> The exigent circumstances exception is present when the demands of the occasion reasonably call for an immediate police response.  More specifically, it includes situations presenting an immediate threatened removal or destruction of evidence.  However, the burden, of course, is upon the government to prove the justification, and whether the requisite conditions exists [sic] is to be measured from the totality of the circumstances.  And in seeking to meet this

burden, the police must be able to point to specific and articulable facts from which it may be determined that the action they took was necessitated by the exigencies of the situation.

. . . .

. . . *[E]xigent circumstances were clearly present.* It is undisputed that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. [T]he arrested person's blood-alcohol level by its very nature dissipates and is forever lost as time passes, and any alcohol ingested by the arrested person is digested and its effects on the body pass[.]

Id. at 232-33, 47 P.3d at 347-48 (cleaned up) (emphasis added).

Id. at 76-77, 481 P.3d at 718-19.

However, in Hewitt, this court also recognized:

[I]n Missouri v. McNeely, 569 U.S. 141, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013) (decided after Entrekin), the United States Supreme Court held "that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." Id. at 165, 133 S. Ct. 1552. The Supreme Court reasoned:

It is true that as a result of the human body's natural metabolic processes, the alcohol level in a person's blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated. . . . Regardless of the exact elimination rate, it is sufficient for our purposes to note that because an individual's alcohol level gradually declines soon after [the person] stops drinking, a significant delay in testing will negatively affect the probative value of the results. . . .

But it does not follow that we should depart from careful case-by-case assessment of exigency and adopt the categorical rule proposed by the State and its amici. In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in Schmerber[ v. California, 384 U.S. 757 (1966)], not to accept the "considerable overgeneralization" that a per se rule would reflect.

The context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a "'now or never'" situation. In contrast to, for example, circumstances in which the suspect has control over

14

> easily disposable evidence, [blood alcohol concentration] evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner. . . .
>
> The State's proposed per se rule also fails to account for advances in the 47 years since Schmerber was decided that allow for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple. The Federal Rules of Criminal Procedure were amended in 1977 to permit federal magistrate judges to issue a warrant based on sworn testimony communicated by telephone. . . . States have also innovated. Well over a majority of States allow police officers or prosecutors to apply for search warrants remotely through various means, including telephonic or radio communication, electronic communication such as e-mail, and video conferencing.
>
> Id. at 152-54, 133 S. Ct. 1552 (cleaned up) (citing, among other states' court rules, [HRPP] Rule 41(h)-(i) (2013)).

Id. at 77-78, 481 P.3d at 719-20 (footnote omitted); see also State v. Niceloti-Velazquez, 139 Hawaiʻi 203, 205, 386 P.3d 487, 489 (App. 2016) (citing McNeely and ruling that "the record does not support a finding that, given the totality of the circumstances, the police officers could not have reasonably obtained a search warrant before drawing Velazquez's blood sample").

With this legal framework in mind, we ruled in Hewitt that the State failed to adequately develop the record to demonstrate the existence of exigent circumstances that would have justified the arresting officer's requesting a warrantless blood draw from the defendant. Id. at 79, 481 P.3d at 721. We reasoned that under the totality of the circumstances, it would not have been unreasonable for a judge to require more information before issuing a warrant for a blood draw. Id. We also noted there was no evidence that any police officer attempted to contact a judge to obtain a warrant before requesting the blood draw. Id.

Similarly, here, the State failed to adequately develop the record to demonstrate the existence of exigent circumstances to justify the arresting officer's requesting a warrantless blood draw from Armitage. Following a suppression hearing, the Circuit Court found, and it is undisputed, that: (1) Sgt. White was dispatched to the accident scene on April 24, 2016, at 8:40 p.m.;

15

(2) Sgt. White, who was the first officer to interact with Armitage, determined that she was the operator of the vehicle involved in the accident and a suspect in the case; and (3) Sgt White observed that Armitage showed indicia of intoxication. There was no evidence that any police officer involved in the investigation sought a search warrant to draw Armitage's blood.

The Circuit Court made the following findings of fact (**FOFs**) and conclusions of law (**COLs**) in ruling that exigent circumstances justified the warrantless blood draw from Armitage:

> [FOF 44]. A [HPD] investigator would take 2-3 hours to prepare a search warrant. The draft search warrant is normally reviewed by a Deputy Prosecuting Attorney ("Deputy Prosecutor") from the City and County of Honolulu Department of the Prosecuting Attorney, and could take an additional 1-1.5 hours. If the draft search warrant is approved by the Deputy Prosecutor, the HPD Investigator then contacts the on-call District Court Judge on Oahu for a review and approval of the search warrant, a process that takes additional time. HPD does not have any other procedure to obtain a search warrant.
>
> [FOF 45]. [HRPP] Rule 41 allows telephonic warrants.[9]
>
> . . . .

---

[9] HRPP Rule 41 provides, in relevant part:

**Rule 41. SEARCH AND SEIZURE.**

. . . .

**(c) Issuance and contents.** A warrant shall issue only on an affidavit or affidavits sworn to before the judge and establishing the grounds for issuing the warrant. . . .

. . . .

**(h) Warrant issuance on oral statements.** In lieu of the written affidavit required under section (c) of this rule, a sworn oral statement, in person or by telephone, may be received by the judge, which statement shall be recorded and transcribed, and such sworn oral statement shall be deemed to be an affidavit for the purposes of this rule. Alternatively to receipt by the judge of the sworn oral statement, such statement may be recorded by a court reporter who shall transcribe the same and certify the transcription. In either case, the recording and the transcribed statement shall be filed with the clerk.

**(i) Duplicate warrants on oral authorization.** The judge may orally authorize a police officer to sign the signature of the judge on a duplicate original warrant, which shall be deemed to be a valid search warrant for the purposes of this rule. The judge shall enter on the face of the original warrant the exact time of issuance and shall sign and file the original warrant and, upon its return, the duplicate original warrant with the clerk.

> [COL 26]. It is undisputed that "the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system." Entrekin, 98 Hawaiʻi at 233 (citing Schmerber v. California, 384 U.S. 757, 770 (1966)).
>
> [COL 27]. In this case, the inability to obtain a search warrant within 2 hours, coupled with dissipation of blood alcohol, and the time it took to investigate the case and determine that Defendant was a suspect, collectively created an exigency of unrecoverable evidence. . . .

(Footnote added.)

Armitage does not challenge any of the Circuit Court's FOFs by number. However, she disputes the Circuit Court's conclusion that "HPD's desire to [follow] their own procedures, ignoring HRPP Rule 41's allowance of telephonic warrants," combined with other factors to create an exigency. We construe this contention as challenging FOF 44 in substance. Armitage also challenges COL 27, which actually presents mixed findings of fact and a conclusion of law.

In FOF 44, the Circuit Court found that HPD's normal procedure to apply for a search warrant takes three to four and a half hours, plus additional time for review and approval by a judge. In COL 27, the court further concluded that "[i]n this case, [there was an] inability to obtain a search warrant within two hours[,]" which is a finding of fact. The record lacks substantial evidence to support either of these findings, which appear to be based on the testimony of HPD Corporal Richard Simifranca (**Cpl. Simifranca**), who assisted in the investigation of the collision and who secured a search warrant for Armitage's vehicle. During the suppression hearing, Cpl. Simifranca was asked how long it takes him to prepare a search warrant. He responded: "Oh, I would say it takes me, because I'm not -- I've only done it like I think twice before, it takes me probably about -- anywhere from two to three hours." Cpl. Simifranca further testified that the time it takes him to meet with the assigned deputy prosecutor is "about another hour and a half[.]" He based his testimony on the example of seeking a search warrant for an automobile, which he conceded would be stored in a secure HPD warehouse. Cpl. Simifranca testified that he had never sought a search warrant that had "a time of the essence factor"

17

and he "really d[id]n't know how to do that kind of a search warrant [involving any kind of spoilage or time sensitivity], because [he] just never had experience doing one[.]"  We conclude this testimony is not "of sufficient quality and probative value" to support the above-identified findings in FOF 44 and COL 27.  Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007).  Hence, COL 27 is clearly erroneous.  See id.

Further, the court acknowledged in FOF 45 that HRPP Rule 41 allows for telephonic warrants, but also found in FOF 44 that HPD does not have any procedure in place, other than its normal procedure, to obtain a warrant, i.e., it does not (or did not at the time of the suppression hearing) have a procedure in place to obtain telephonic warrants under HRPP Rule 41.  The court explicitly made this distinction during the suppression hearing, as follows:

> THE COURT:  Rule 41 of the Hawaiʻi Rules of Penal Procedure has never been exercised and put into practice in the First District.
>
> [DEFENSE COUNSEL]:  And I think we know why, at this point.  I don't think HPD knows how to use it, or know that it exists, according to the testimony we have.
>
> THE COURT: But there are no telephonic warrants in the First District.  And there is no procedure for telephonic warrants.
>
> [DEFENSE COUNSEL]:  Well, I think there is.  It's laid out in Rule 41(h).
>
> THE COURT:  The rule provides for it.
>
> [DEFENSE COUNSEL]: Right.
>
> THE COURT:  But the actual working of it is not in practice, and not in play. . . .

The basis for the Circuit Court's finding in FOF 44 — that "HPD does not have any other procedure to obtain a search warrant" — is not clear from the record.  During the suppression hearing, Cpl. Simifranca testified simply that he "[did not] know of any other way to get a search warrant other than the way that [he] just described . . . ."  The DPA later stated:  "It is my understanding, as what the court has indicated, that there was no telephonic procedures in place [to obtain a warrant] at the time

18

of this incident. But defense counsel is not willing to stipulate to that." On this record, the evidence is not "of sufficient quality and probative value" to support the Circuit Court's finding that "HPD does not have any other procedure to obtain a search warrant." Klink, 113 Hawaiʻi at 351, 152 P.3d at 523. Moreover, even if HPD had no procedure in place to obtain a telephonic warrant at the time of the suppression hearing, that fact would not support the Circuit Court's finding in COL 27 that "[i]n this case, [there was an] inability to obtain a search warrant within two hours."[10] (Emphasis added.) HRPP Rule 41 plainly authorized telephonic warrants, and nothing in the record supports a conclusion that HPD was unable to implement a procedure to make use of that rule for time-sensitive matters. For these additional reasons, we conclude that COL 27 is clearly erroneous.

We reject the State's two-fold argument that Armitage failed to properly challenge the Circuit Court's ruling that exigent circumstances justified the warrantless blood draw. First, the State argues that Armitage failed to include in the appellate record one of the transcripts of the four-day hearing on her motion to suppress, specifically the August 13, 2018 hearing transcript. However, this transcript, which Armitage timely ordered, was made part of the record after briefing concluded, and it supports our analysis of the exigency issue. Second, the State agues that Armitage did not properly challenge the findings of fact underlying the Circuit Court's legal conclusion that exigent circumstances justified the warrantless blood draw. This argument lacks merit for the reasons previously stated; Armitage challenged FOF 44 in substance, and also challenged COL 27, which presented mixed issues of fact and law.

---

[10] There is also no basis for the Circuit Court's seeming imposition of a two-hour time limit on obtaining a search warrant to draw blood from a suspect in these circumstances. Cf. HRS § 291E-3(b) (in any criminal prosecution for OVUII, the amount of alcohol found in the defendant's blood or breath within three hours after the time of the alleged violation as shown by chemical analysis of the defendant's blood is competent evidence concerning whether the defendant was under the influence of an intoxicant at the time of the alleged violation); id. § 291E-3(d) (nothing in § 291E-3 limits the introduction of relevant evidence of a person's alcohol concentration obtained more than three hours after an alleged OVUII violation).

Accordingly, the record does not support the conclusion that given the totality of the circumstances, the investigating police officers could not reasonably have obtained a search warrant before drawing Armitage's blood. Because the prosecution failed to adequately develop the record to demonstrate that the police officers were justified to act without a warrant, the Circuit Court clearly erred in ruling that exigent circumstances existed to justify the warrantless draw of Armitage's blood.

Once it has been determined that evidence was erroneously admitted, the appellate court must consider whether the erroneous admission was harmless beyond a reasonable doubt. State v. Matsumoto, 145 Hawaiʻi 313, 327, 452 P.3d 310, 324 (2019) (citing State v. McCrory, 104 Hawaiʻi 203, 210, 87 P.3d 275, 282 (2004)); see State v. Apo, 82 Haw. 394, 403, 922 P.2d 1007, 1016 (App. 1996) ("The admission of illegally obtained evidence in a criminal trial following the erroneous denial of a motion to suppress is subject to the harmless error rule."). "The erroneous admission of evidence is not harmless when there is a reasonable possibility that the error might have contributed to the conviction." State v. Baker, 147 Hawaiʻi 413, 435, 465 P.3d 860, 882 (2020) (citing McCrory, 104 Hawaiʻi at 210, 87 P.3d at 282). "If such a reasonable possibility exists, then the error is not harmless beyond a reasonable doubt and the judgment of conviction on which it may have been based must be set aside." Id. (citing McCrory, 104 Hawaiʻi at 210, 87 P.3d at 282).

Here the jury was instructed that the offense of Negligent Homicide in the First Degree can be committed in either of two ways:

> As to the first alternative, a person commits the offense of Negligent Homicide in the First Degree (Under the Influence) if she causes the death of another person by the operation of a vehicle in a negligent manner while under the influence of alcohol.
>
> . . . .
>
> As to the second alternative, a person commits the offense of Negligent Homicide in the First Degree (Vulnerable User) if she causes the death of a vulnerable user by the operation of a vehicle in a negligent manner.

With respect to the first alternative, the jury was instructed:

20

"Under the influence" means that a person:

    1. Is under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty [(**first definition)**]; or

    2. Has .08 or more grams of alcohol per 100 milliliters or cubic centimeters of the person's blood [(**second definition**)].

Thus, the jury was instructed that one of the ways it could convict Armitage of Negligent Homicide in the First Degree was if the prosecution proved beyond a reasonable doubt that Armitage caused the death of Kaulana by operating a vehicle in a negligent manner while Armitage had .08 or more grams of alcohol per 100 cubic centimeters of her blood. The erroneously admitted result of Armitage's blood alcohol test was that on the night of the incident when her blood was drawn, she had .13 grams of alcohol per 100 cubic centimeters of whole blood.

Under these circumstances, where the jury was instructed that "under the influence" meant, *inter alia*, a blood-alcohol concentration of .08 or higher, and the erroneously admitted result of Armitage's blood alcohol test by itself satisfied that definition, we cannot conclude there was no reasonable possibility that the error might have contributed to Armitage's conviction. Accordingly, the error was not harmless beyond a reasonable doubt, and the conviction for Negligent Homicide in the First Degree must be set aside. See Baker, 147 Hawaiʻi at 435, 465 P.3d at 882.

We further conclude that without considering evidence of Armitage's blood alcohol test result, there was sufficient evidence to convict her of Negligent Homicide in the First Degree under the first alternative (Under the Influence), based on the first definition of "under the influence," *i.e.*, "under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty." HRS § 291E-1(1). First, the State presented substantial evidence at trial that Armitage caused the death of Kaulana by driving the subject vehicle in a negligent manner. Specifically, Wakinekona testified that on the

21

night of the incident, he drove ahead of Armitage on Farrington Highway while she followed behind; they both were "weaving through traffic"; and they both were "driving fast and going in between cars." Another witness testified that the two vehicles "flew by him," as he drove his own vehicle at 40 miles per hour. The State also presented evidence that near the area of Kalaniana'ole Beach Park, Armitage's vehicle hit Kaulana, whose body landed 198 feet from the area of impact; the posted speed limit in the area of the collision was 35 miles per hour; the speed of the impact was 60 miles per hour or faster; there were no skid marks, scuff marks, yaw marks, or tire marks at the scene of the collision, indicating "there was no reaction" by the driver; Armitage's vehicle was extensively damaged by the impact, consistent with having hit Kaulana; and Kaulana "was killed crossing Farrington Highway by a vehicle traveling at a high rate of speed."

Second, the State presented substantial evidence at trial that Armitage caused Kaulana's death while under the influence of alcohol in an amount sufficient to impair her normal mental faculties or ability to care for herself and guard against casualty. Specifically, the State presented evidence that on the night of the incident, Armitage had two mai tais during dinner and a shot of liquor after dinner; she collided with Kaulana while driving her vehicle at a high rate of speed; when police responded to Armitage's location, she had "a very strong odor of alcohol" and "red, glassy eyes," and "throughout the entire time, she was having a hard time maintaining balance"; Armitage performed poorly on the standardized field sobriety tests that were administered to her; and, after her arrest, Armitage stated to the arresting officer that "she's not going to lie, she had eight beers[.]"[11/] Accordingly, on this record, even without considering evidence of Armitage's blood alcohol test result, the evidence was sufficient to support Armitage's conviction for Negligent Homicide in the First Degree.

---

[11/] Following the suppression hearing, the Circuit Court concluded that this statement and others "were not in response to any actions of the [HPD], i.e, were spontaneous, not the products of interrogation, and therefore admissible." Armitage does not challenge this COL on appeal.

**NOT FOR PUBLICATION IN WEST'S HAWAII REPORTS OR THE PACIFIC REPORTER**

Therefore, IT IS HEREBY ORDERED that the Judgment of Conviction and Sentence, entered on November 1, 2019, in the Circuit Court of the First Circuit, is vacated, and this case is remanded to the Circuit Court for a new trial.

DATED:  Honolulu, Hawaiʻi, October 22, 2021.


On the briefs:

Andrew T. Park
for Defendant-Appellant.

Chad M. Kumagai,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Plaintiff-Appellee.

/s/ Katherine G. Leonard
Presiding Judge


/s/ Keith K. Hiraoka
Associate Judge


/s/ Clyde J. Wadsworth
Associate Judge

23