*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND THE PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-16-0000460
15-MAR-2023
09:06 AM
Dkt. 21 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Respondent/Plaintiff-Appellee,

vs.

CYRINA L. HEWITT,
Petitioner/Defendant-Appellant.

SCWC-16-0000460

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000460; CRIMINAL NO. 3DTA-15-00745)

MARCH 15, 2023

McKENNA, WILSON, AND EDDINS, JJ.; AND NAKAYAMA, J., DISSENTING,
WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY McKENNA, J.

## I. Introduction

This appeal addresses <u>Miranda</u> rights arising out of police questioning of a person confined to a hospital bed. Cyrina Hewitt ("Hewitt") was charged in the District Court of the Third Circuit, Kona Division ("district court") with operating a

vehicle under the influence of an intoxicant ("OVUII") and driving without a license ("DWOL"). Hewitt moved to suppress evidence based on a failure to provide Miranda warnings. The district court denied Hewitt's motion, and Hewitt was convicted of both offenses after a bench trial.

On appeal to the Intermediate Court of Appeals ("ICA"), Hewitt argued in part that she had been subjected to custodial interrogation without the requisite Miranda warnings. In State v. Hewitt, 149 Hawai'i 71, 481 P.3d 713 (App. 2021), a published opinion, the ICA held that Miranda warnings were not required because Hewitt was not in custody at the time of questioning.

The ICA ruled Hewitt was not entitled to Miranda warnings because (1) her inability to leave the scene of questioning was not the result of detention by law enforcement; (2) the officers did not have probable cause to arrest until Hewitt stated she had been driving a truck; and (3) the record did not reflect sustained and coercive questioning of Hewitt by the officers. Hewitt, 149 Hawai'i at 75, 481 P.3d at 717. The ICA also held, however, that the district court erred by (1) overruling Hewitt's Hawai'i Revised Statutes ("HRS") § 621-26 (1993) trial objection by failing to conduct a voluntariness hearing; and (2) denying Hewitt's motion to suppress her blood test result because a search warrant had not been obtained. 149 Hawai'i at 76, 79, 481 P.3d at 718, 721. On these grounds, the ICA vacated

2

Hewitt's convictions and remanded.

Hewitt sought certiorari review of the district court's motion to suppress denial and the ICA's Miranda analysis. Hewitt posited that, under the ICA's rationale, anyone hospitalized but not under arrest need not be Mirandized because law enforcement did not prevent their ability to leave.

We agree with Hewitt that the district court and ICA erred. First, we hold that Hewitt was in custody when probable cause developed. State v. Sagapolutele-Silva, 151 Hawaiʻi 283, 511 P.3d 782 (2022), overruled the bright-line rule articulated in State v. Ketchum, 97 Hawaiʻi 107, 34 P.3d 1006 (2001), underlined below, which clearly held:

> [A] person is "in custody" for purposes of article I, section 10 of the Hawaiʻi Constitution if an objective assessment of the totality of the circumstances reflects either (1) that the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive, such that they are no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) that the point of arrest has arrived because either (a) probable cause to arrest has developed or (b) the police have subjected the person to an unlawful "*de facto*" arrest without probable cause to do so.

Ketchum, 97 Hawaiʻi at 126, 34 P.3d at 1025 (emphases added). The Sagapolutele-Silva majority said it was clarifying that, despite this holding, the existence of probable cause is not conclusive and is only a factor to consider in determining whether someone is in custody under a "totality of circumstances" and therefore entitled to Miranda warnings. Sagapolutele-Silva, 151 Hawaiʻi at 287, 511 P.3d at 786.

3

We now expressly overrule Sagapolutele-Silva's abrogation of Ketchum's bright-line rule and hold that the Ketchum rule remains in effect: Miranda warnings are required by article I, section 10 of the Constitution of the State of Hawaiʻi when probable cause to arrest has developed. And in Hewitt's case, contrary to the ICA's conclusion, probable cause had developed before she was asked whether she had been driving.

Second, we hold that, based on the totality of circumstances, Hewitt was in custody and was therefore entitled to Miranda warnings even before probable cause developed. In addition to Ketchum's bright-line rule, we have stated, "[W]hether the defendant was in custody or otherwise deprived of [their] freedom of action for Miranda purposes is to be determined from the totality of the circumstances, objectively appraised." State v. Patterson, 59 Haw. 357, 361, 581 P.2d 752, 755 (1978). "These would include the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances." Id.

Police interrogation occurring in a medical treatment setting presents a special circumstance under the "totality of circumstances" test. In United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012), the United States Court of Appeals for the First Circuit addressed whether the Fifth Amendment requires

4

<u>Miranda</u> warnings under these circumstances. The court noted that when a person is unable to leave the place of an interrogation solely due to circumstances incident to medical treatment, it must be determined whether they were at liberty to terminate the interrogation and cause the officers to leave. 701 F.3d at 396.

We generally adopt the First Circuit's approach for purposes of our constitution's article I, section 10 right against self-incrimination. We hold that if a person is unable to leave a place of interrogation due to circumstances incident to medical treatment, determining whether the person is "in custody" under a totality of circumstances requires an inquiry into whether the person was at liberty to terminate the interrogation and cause the officer to leave.

As further discussed below, under the "totality of circumstances" of this case, Hewitt was in custody well before probable cause developed. Hence, the district court and the ICA erred by holding that <u>Miranda</u> warnings were not required until Hewitt responded affirmatively to an officer's question as to whether she had been driving a truck found damaged on a roadside.

Hewitt's convictions have already been set aside, however, based on developments discussed in Section IV.A below. The nolle prosequi of both counts raises appellate jurisdiction and

5

mootness questions.  Hence, before addressing the merits of the issues on certiorari, we explain why appellate jurisdiction was retained.  We also clarify that mootness is a prudential consideration and not an issue of subject matter jurisdiction, and that the public interest exception to the mootness doctrine applies.

Remand is no longer appropriate, however, whether for the grounds stated in the ICA opinion or in this opinion, and it is unnecessary to determine precisely when Hewitt should have been provided Miranda warnings.  Based on the procedural posture of this case, we reverse the ICA's March 18, 2021 Judgment on Appeal and affirm the district court's August 9, 2021 judgment of nolle prosequi of both counts.

## II.  Background

### 1.  Factual background

In 2014, Hawaiʻi County Police Department ("HCPD") Officers Chandler Nacino ("Officer Nacino") and Kaea Sugata ("Officer Sugata") were called to Kona Community Hospital to interview Hewitt as a possible assault victim.  An unknown male had dropped Hewitt off at the hospital's emergency room, and hospital staff contacted HCPD regarding Hewitt possibly being an assault victim.  Hewitt had large contusions on her face, eyes that were swollen shut, a laceration on her ear, and a broken breast plate.  Although awake, Hewitt appeared disoriented and

6

was "rambling incoherently." She did not know where she was or why she was in the hospital.

Officers Nacino and Sugata first encountered Hewitt at around one o'clock in the morning. They waited for the nurse administering Hewitt's treatment to leave before starting an interview. Hewitt gave the officers her name and birth date. Officer Nacino then served Hewitt with a "legal document" for an unrelated case and told her she needed to sign it.[1] Both officers stood at Hewitt's bedside during the interview while Officer Nacino did the majority of the talking.

Officer Nacino asked Hewitt whether she had been assaulted and why her eyes were swollen. Hewitt first responded she had pink-eye, but later said she had a stye. To Officer Nacino, Hewitt's injuries did not appear consistent with either explanation.

At some point, Hawai'i Fire Department ("HFD") paramedics walked by and asked what was going on. Officer Nacino said they were investigating a possible assault. The paramedics said they had seen a truck's taillights sticking out from roadside bushes.

---

[1] As the ICA noted, "[t]he record does not show what the document was, to what case it pertained, or why Officer Nacino had possession of the document at the time he was assigned to investigate an unidentified potential assault victim." Hewitt, 149 Hawai'i at 73 n.4, 481 P.3d at 715 n.4.

The police officers then left the room[2] and contacted Sergeant Mekia Rose ("Sergeant Rose") to check on the truck.

Sergeant Rose located an unoccupied truck in some bushes on the shoulder of the road at the Queen Kaʻahumanu Highway and Kuakini Highway intersection. The truck had front-end damage, and both of its airbags had been deployed. Sergeant Rose found Hewitt's identification card in the truck and sent a photo of it via text message to Officer Nacino. He also relayed the truck's license plate number, a check of which revealed that the vehicle belonged to a "Cyrus Hewitt."

Officer Nacino returned to the room and asked Hewitt whether she had been in a traffic accident. Hewitt answered yes, first stating that she was driving to a friend's house and parked her vehicle there but later stating that she was going to a doctor's appointment. After this response, the officers stopped asking further questions and placed Hewitt under arrest for suspicion of OVUII.

Before the arrest, the officers did not provide Hewitt any Miranda warnings. They also did not tell Hewitt whether she was free to not respond to questions, leave, or terminate the conversation.

After this, at around four o'clock in the morning, Hewitt

_____

[2]     The record does not reflect exactly when the officers left the room, but trial testimony suggests that the officers did leave at some point and "returned" or "recontacted" Hewitt after locating her vehicle.

was subjected to a blood draw without a search warrant having been requested or obtained.  Officer Nacino remained with Hewitt until the blood draw was completed.  He also ran a check on Hewitt's driver's license and learned that she had a suspended license.

## 2.   District court proceedings

On March 12, 2015, the State of Hawaiʻi ("the State") charged Hewitt with OVUII and DWOL.  Before trial, Hewitt filed a motion to suppress statements alleging a violation of her constitutional rights under the federal and state constitutions.  At the hearing just before the October 28, 2015 trial, the State argued that because Hewitt was not in custody, there was no constitutional violation.  The district court[3] denied the motion to suppress and ultimately convicted Hewitt of OVUII in violation of HRS § 291E-61(a)(1) (2007)[4] and DWOL in violation of HRS § 286-102(b) (Supp. 2013).[5]

---

[3]     The Honorable Margaret K. Masunaga presided.

[4]     **§291E-61 Operating a vehicle under the influence of an intoxicant.**
(a) A person commits the offense of operating a vehicle under the influence of an intoxicant if the person operates or assumes actual physical control of a vehicle:
(1) While under the influence of alcohol in an amount sufficient to impair the person's normal mental faculties or ability to care for the person and guard against casualty[.]

HRS § 291E-61(a)(1) (2007).

[5]     **§286-102 Licensing.**
        . . . .
(b) A person operating the following category or combination of categories of motor vehicles shall be examined as provided in section 286-108 and duly licensed by the examiner of drivers:

9

### 3.   ICA proceedings

Hewitt filed a notice of appeal on June 14, 2016.  On appeal, Hewitt argued, inter alia, that the district court erred in denying her motion to suppress because she had been subjected to custodial interrogation without any Miranda warnings before her statement.  In a published opinion, the ICA concluded, in relevant part, that Hewitt was not in custody at the time of questioning because (1) Hewitt's inability to leave was not the result of detention by law enforcement; (2) the officers did not have probable cause to arrest Hewitt until she stated she had been driving the truck; and (3) the record did not reflect any sustained and coercive questioning of Hewitt by the officers. Hewitt, 149 Hawaiʻi at 75, 481 P.3d at 717.

The ICA also held, however, that the district court erred by overruling Hewitt's HRS § 621-26 (1993)[6] trial objection and

_____

> (1) Mopeds;
> (2) Motorcycles and motor scooters;
> (3) Passenger cars of any gross vehicle weight rating, buses designed to transport fifteen or fewer occupants, and trucks and vans having a gross vehicle weight rating of eighteen thousand pounds or less; and
> (4) All of the motor vehicles in category (3) and any vehicle that is not a commercial motor vehicle.
> A school bus or van operator shall be properly licensed to operate the category of vehicles that the operator operates as a school bus or van and shall comply with the standards of the department of transportation as provided by rules adopted pursuant to section 286-181.

HRS § 286-102(b) (Supp. 2013).

[6]     **§621-26 Confessions when admissible.**  No confession shall be received in evidence unless it is first made to appear to the

10

by failing to conduct a hearing on the voluntariness of her statement;[7] and (2) the district court erred by denying Hewitt's motion to suppress her blood test result.[8]  149 Hawai'i at 76,

---

judge before whom the case is being tried that the confession was in fact voluntarily made.

HRS § 621-26 (1993).

[7]     The ICA held the district court erred by failing to conduct a hearing on the voluntariness of Hewitt's statement that she was driving the vehicle and had parked it in the bushes.  Hewitt, 149 Hawai'i at 76, 481 P.3d at 718. The ICA ruled that, rather than overruling Hewitt's HRS § 621-26 objection, the district court should have conducted an evidentiary hearing to determine whether Hewitt's statement was voluntarily made, in light of the evidence that Hewitt had sustained significant head trauma, did not know where she was, and was incoherent.  Id.

[8]     The ICA noted that although the State argued that Hewitt's motion to suppress evidence of the alcohol content of her blood was not timely filed under Hawai'i Rules of Penal Procedure ("HRPP") Rule 12(c) (2007), the district court had the discretion to proceed to rule on the merits, citing State v. Przeradski, 5 Haw.App. 29, 32, 677 P.2d 471, 474-75 (1984), and therefore, the denial of the motion on its merits was properly before the ICA.  Hewitt, 149 Hawai'i at 76, 481 P.3d at 718.  The ICA appropriately noted that although the district court relied upon Schmerber v. California, 384 U.S. 757 (1966) in denying Hewitt's motion to suppress, Missouri v. McNeely, 569 U.S. 141 (2013), which was decided after State v. Entrekin, 98 Hawai'i 221, 47 P.3d 336 (2002) (discussing Schmerber), held "that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant."  149 Hawai'i at 77, 481 P.3d at 719.  The ICA noted that it cited McNeely in State v. Niceloti-Velazquez, 139 Hawai'i 203, 386 P.3d 487 (App. 2016), in which it held the trial court erred by holding exigent circumstances existed to justify the warrantless extraction of the defendant's blood sample, because the trial court only cited the risk of blood alcohol dissipation to support its finding of exigency and the State failed to adequately develop the record to demonstrate that the police officers were justified to act without a warrant.  149 Hawai'i at 78, 481 P.3d at 720.

The ICA opined that the facts of this case illustrate why more than just "the risk of blood dissipation" should be required to justify a warrantless blood draw.  Id.  The ICA stated that Officer Nacino did not testify that he detected an odor similar to that of an alcoholic beverage on Hewitt's breath or body; there was no evidence that empty or open containers of liquor, or a bar or restaurant tab or other receipt evidencing the recent consumption of alcohol, were found in Hewitt's truck or with her identification card; Hewitt's apparent disorientation could have been explained by a concussion, as evidenced by her significant head trauma; although she knew who she was, she did not know where she was; there was no evidence that Officer Nacino attempted to determine if Hewitt was oriented to time (as one would to attempt to diagnose or rule out a concussion); and

11

79, 481 P.3d at 718, 721.  The ICA remanded the case for a new trial.

## 4.  Certiorari

Hewitt's certiorari application presents a single question: whether the ICA gravely erred in holding that the district court did not err in denying Hewitt's motion to suppress because Hewitt was not in custody.  We accepted certiorari.

## III.  Standard of Review

"An appellate court reviews a ruling on a motion to suppress de novo to determine whether the ruling was 'right' or 'wrong.'"  State v. Weldon, 144 Hawai'i 522, 530, 445 P.3d 103, 111 (2019) (quoting State v. Tominiko, 126 Hawai'i 68, 75, 266 P.3d 1122, 1129 (2011)).

## IV.  Discussion

## A.  Preliminary issues

Before addressing the issue on certiorari, we address unusual developments after our acceptance of certiorari, which,

---

Hewitt's disorientation could also have been the result of prescription medication administered to her in the hospital emergency room.  149 Hawai'i at 79, 481 P.3d at 721.  The ICA concluded that under the totality of these circumstances, it would not have been unreasonable for a judge to require more information before issuing a warrant for a blood draw; there was no evidence that Officer Nacino, Officer Sugata, Sergeant Rose, or any other police officer attempted to contact a judge to obtain a warrant before requesting the blood draw.  Id.  Thus, the ICA held the State failed to adequately develop the record to demonstrate the existence of exigent circumstances that would have justified Officer Nacino requesting a warrantless blood draw, and therefore, the district court erred in denying Hewitt's motion to suppress the blood test results.  Id.

12

at first blush, might appear to raise questions of appellate jurisdiction and mootness.

### 1. Background after acceptance of certiorari

As noted, the ICA's published opinion ruled in the State's favor regarding the motion to suppress denial, and this was the only question raised by Hewitt on certiorari.  Immediately after we entered our order accepting certiorari, however, the State contacted Hewitt's counsel and offered to dismiss Hewitt's case with prejudice if Hewitt dismissed the instant certiorari proceeding.  Hewitt therefore filed a motion requesting a temporary remand of this appeal to the district court.[9]  Our order regarding this motion provided:

> IT IS HEREBY ORDERED that the motion is granted as follows.  This case shall be temporarily remanded to the District Court of the Third Circuit for no more than 30 days.  No later than 30 days after this order, the clerk of the district court shall supplement the record on appeal with all documents entered on temporary remand, and the case shall then resume in the Supreme Court for such further proceedings as may be appropriate.

On remand, the State filed a motion for nolle prosequi[10] with prejudice as to the complaint against Hewitt.  The State indicated it filed the motion "due to the ICA opinion on appeal following bench trial and in the interest of justice."  The

---

[9]     Hawaiʻi Rules of Appellate Procedure ("HRAP") Rule 42 requires appellate court approval of any dismissal.

[10]    The expression nolle prosequi, or more fully, dicit nolle prosequi, means that the government will not prosecute.  The King v. Robertson, 6 Haw. 718, 1889 WL 1054 (Haw. Kingdom 1889).

13

district court[11] granted the motion and filed a judgment indicating a disposition of "nolle prosequi" for both counts. The district court's supplemental record was filed pursuant to our order of temporary remand, and we scheduled oral argument.

Hewitt then filed a motion to set aside the oral argument setting or to clarify the status of the case due to the nolle prosequi on remand.[12]  We entered an order denying the motion to set aside the oral argument, and we now explain why.

2.    **This court retained appellate jurisdiction pursuant to the order of temporary remand**

Based on our order of temporary remand, the district court's judgment of nolle prosequi did not terminate this certiorari proceeding.  Pursuant to HRS § 602-5(a)(6) (Supp. 2004), this court has jurisdiction:

> [t]o make . . . such . . . orders . . . and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to it by law or for the promotion of justice in matters pending before it.

Our order specifically provided that, after remand, the case would resume in this court "for such further proceedings as may be appropriate."  Thus, this court retained appellate jurisdiction despite the nolle prosequi.

---

[11]    The Honorable Robert J. Crudele presided.

[12]    The State's motion requested a dismissal of both counts "with prejudice."  The judgment did not include language indicating the dismissal was with prejudice.  This lack of clarity is immaterial to the issues we discuss.

14

### 3. The "public interest" exception to the mootness doctrine is applicable

Although we retained appellate jurisdiction, the charges against Hewitt were mooted based on the nolle prosequi of both counts.  We therefore address mootness.

We first clarify that mootness is a prudential consideration and not an issue of subject matter jurisdiction, as we have stated, even recently.[13]  Tax Foundation v. State, 144 Hawaiʻi 175, 439 P.3d 127 (2019), addressed standing, a "prudential concern of judicial governance" like "mootness":

> As explained by Justice Nakamura in Trustees of the Office of Hawaiian Affairs v. Yamasaki, 69 Haw. 154, 737 P.2d 446 (1987):
>
>> Unlike the federal judiciary, the courts of Hawaiʻi are not subject to a cases or controversies limitation like that imposed by Article III, § 2 of the United States Constitution.  But like the federal government, ours is one in which the sovereign power is divided and allocated among three co-equal branches.  Thus, we have taken the teachings of the Supreme Court to heart and adhered to the doctrine that the use of judicial power to resolve public disputes in a system of government where there is a separation of powers should be limited to those questions capable of judicial resolution and presented in an adversary context.  And, we have admonished our judges that even in the absence of constitutional restrictions, they must still carefully weigh the wisdom, efficacy, and timeliness of an exercise of their power before acting, especially where there may be an intrusion into areas committed to other branches of government.

---

[13]     See, e.g., Skahan v. Stutts Constr. Co., Inc., 148 Hawaiʻi 460, 468 n.7, 478 P.3d 285, 293 n.7 (2021); Hawaiʻi Tech. Acad. v. L.E., 141 Hawaiʻi 147, 156, 407 P.3d 103, 112 (2017); In Re Marn Fam., 141 Haw. 1, 7, 403 P.3d 621, 627 (2016).

15

> Our guideposts for the application of the rules of judicial self-governance founded in concern about the proper — and properly limited — role of courts in a democratic society reflect the precepts enunciated by the Supreme Court. When confronted with an abstract or hypothetical question, we have addressed the problem in terms of a prohibition against rendering advisory opinions; when asked to decide whether a litigant is asserting legally recognized interests, personal and peculiar to him, we have spoken of standing; when a later decision appeared more appropriate, we have resolved the justiciability question in terms of ripeness; and when the continued vitality of the suit was questionable, we have invoked the mootness bar.

> Thus, Yamasaki recognizes that standing is a prudential concern in Hawaiʻi state courts, which are not subject to the case and controversy subject matter jurisdiction limitation of federal courts. Yamasaki also noted that standing is a prudential concern "founded in concern about the proper – and properly limited – role of courts in a democratic society."

Tax Foundation, 144 Hawaiʻi at 190–91, 439 P.3d at 142–43 (quoting Yamasaki, 69 Haw. at 170-72, 737 P.2d at 455-56) (cleaned up).

As noted in Yamasaki, "mootness," like "standing," is a prudential concern not subject to the "case and controversy" subject matter jurisdiction limitation of federal courts. 69 Haw. at 170-72, 737 P.2d at 455-56. In Tax Foundation, we noted that courts of other states recognize that standing is a prudential concern regarding justiciability and is not an issue of subject matter jurisdiction. 144 Hawaiʻi at 191, 439 P.3d at 143. Most other state courts also recognize that mootness is a prudential concern regarding justiciability, not an issue of subject matter jurisdiction. See, e.g., Matter of Big Foot Dumpsters & Containers, LLC, 507 P.3d 169, 173 (Mont. 2022)

16

(noting mootness is a concept of justiciability); Nesbitt v. Frakes, 911 N.W.2d 598, 603 (Neb. 2018) (holding mootness is a justiciability doctrine that does not prevent appellate jurisdiction); Couey v. Atkins, 355 P.3d 866, 901 (Or. 2015) (holding that the Oregon state constitution does not require dismissal of a case based on the justiciability doctrine of mootness); DeMarco v. Travelers Ins. Co., 102 A.3d 616, 622 (R.I. 2014) (holding mootness is a distinct concept, separate and apart from subject-matter jurisdiction); Wylie v. State of Idaho Transp. Bd., 253 P.3d 700, 705 (Idaho 2011) (noting mootness is a subcategory of justiciability); McIntyre v. Traughber, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994) (noting mootness is a doctrine of justiciability). Thus, mootness is an issue of justiciability, not an issue of subject matter jurisdiction.

Under Hawaiʻi law, a well-recognized exception to the mootness doctrine is for matters "affecting the public interest." See State v. Kiese, 126 Hawaiʻi 494, 509, 273 P.3d 1180, 1195 (2012). This exception applies here.

Only after we accepted Hewitt's certiorari application on an issue for which the ICA had ruled in the State's favor in a published opinion did the State offer to dismiss Hewitt's case with prejudice; the State made the offer conditioned upon Hewitt's dismissal of this appeal. On temporary remand, the

17

State indicated it filed the motion to nolle prosequi the case with prejudice for two reasons: "the ICA opinion on appeal following bench trial"; and "in the interest of justice." The State may have realized that the district court had erred with respect to voluntariness, especially due to the testimony regarding Hewitt's condition during questioning. The State may also have realized that, as ruled by the ICA, a search warrant should have been obtained before the blood draw. But this court had just accepted certiorari on the custody issue, an issue on which the State had obtained a favorable opinion from the ICA. If this certiorari was dismissed pursuant to the State's offer, the ICA's published opinion would remain as precedent despite the errors of law discussed in Section IV.B below.

Under these circumstances, the "public interest" exception to the mootness doctrine applies. Although factually and procedurally distinguishable, concerns expressed in Ocean Resort Villas Vacation Owners Ass'n v. County of Maui, 147 Hawai'i 544, 465 P.3d 991 (2020), which addressed "stipulated reversals" of trial court judgments are instructive. In that case, we cited to a law review article highlighting the "'tangible but frequently undetectable social costs' of allowing [appellate] courts to consider vacaturs based solely on the parties' settlement during the pendency of an appeal":

18

> The costs . . . include the . . . loss of precedential value for judicial decisions, and a diminished respect for the judicial process. . . . A procedure which allows parties to obtain vacatur as a matter of right . . . will encourage parties to delay settlement until after trial because the effects of an adverse judgment can be avoided at little or no cost by postjudgment settlement. The procedure . . . will place the defense of the integrity of judicial decisions in the hands of litigants who are not in a position to safeguard the public values inherent therein.

147 Hawaiʻi at 560, 465 P.3d at 1007 (quoting Jill E. Fisch, Rewriting History: The Propriety of Eradicating Prior Decisional Law Through Settlement and Vacatur, 76 Cornell L. Rev. 589, 641-42 (1991)) (cleaned up).

Allowing the State to nolle prosequi charges after a favorable ICA opinion in exchange for dismissal of an appeal would likewise (1) result in the loss of precedential value of judicial decisions from this court; (2) cause a diminished respect for the judicial process; (3) allow parties to obtain dismissal as a matter of right, which could encourage the State to delay offering dismissal until after certiorari is accepted to see if a possible adverse opinion can be avoided; and (4) place the defense of the integrity of judicial decisions in the hands of litigants who are not in a position to safeguard the public values inherent therein.[14] However well-intentioned the

---

[14] With respect to (4), an individual defendant has no real incentive to continue with a certiorari proceeding after receiving an offer to nolle prosequi with prejudice. The nolle prosequi would be a sure thing, and a defendant does not know how this court will rule on certiorari. We have no concern with the actions taken by Hewitt's counsel after receipt of the State's offer to nolle prosequi with prejudice in exchange for a dismissal of the appeal. Counsel's obligation was to represent Hewitt's interests, and counsel took appropriate actions to do so.

19

State's offer might have been, dismissal would have precluded this court from reviewing an issue on which the State had obtained a favorable published opinion from the ICA.  For the reasons discussed in Section III.B below, the public interest exception to the mootness doctrine applies here despite the dismissal of the charges against Hewitt.

**B.  Custody**

We therefore address the merits of the issue raised on certiorari:  whether the ICA erred in determining that Hewitt was not in custody at the time she made her statements and that Miranda warnings were therefore not required.

**1.    General Miranda principles**

The Fifth Amendment to the U.S. Constitution provides, in relevant part, that no person "shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  Article I, section 10 of the Hawai'i Constitution similarly guarantees a privilege against self-incrimination to our state's citizens.  See State v. Ah Loo, 94 Hawai'i 207, 210, 10 P.3d 728, 731 (2000).  Miranda warnings help safeguard this right:

> The Miranda rule is, at core, a constitutionally prescribed rule of evidence that requires the prosecution to lay a sufficient foundation—i.e., that the requisite warnings were administered and validly waived before the accused gave the statement sought to be adduced at trial—before it may adduce evidence of a defendant's custodial statements that stem from interrogation during [their] criminal trial.

20

The prosecution's burden of establishing that the requisite warnings were given, however, is not triggered unless the totality of the circumstances reflect that the statement it seeks to adduce at trial was obtained as a result of "custodial interrogation," which, as the United States Supreme Court defined it in Miranda, consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [their] freedom of action in any significant way." In other words, the defendant, objecting to the admissibility of [their] statement and, thus, seeking to suppress it, must establish that [their] statement was the result of (1) "interrogation" that occurred while [they were] (2) "in custody."

State v. Wallace, 105 Hawaiʻi 131, 137, 94 P.3d 1275, 1281 (2004) (cleaned up). Thus, a statement made by a defendant under custodial interrogation without a Miranda warning must be suppressed as unconstitutionally elicited.

**2.  Hewitt was in custody when probable cause developed and Sagapolutele-Silva is overruled to the extent it said the existence of probable cause is not dispositive on the issue of whether a person is in custody for purposes of Miranda warnings required by the Hawaiʻi constitution**

In Ketchum, we articulated that a person is in custody for purposes of Miranda warnings as required by the Hawaiʻi Constitution:

[I]f an objective assessment of the totality of the circumstances reflects either (1) that the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive, such that they are no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) that the point of arrest has arrived because either (a) probable cause to arrest has developed or (b) the police have subjected the person to an unlawful "de facto" arrest without probable cause to do so.

Ketchum, 97 Hawaiʻi at 126, 34 P.3d at 1025.

21

The majority in Sagapolutele-Silva said it was clarifying that despite this holding, the existence of probable cause is but one factor in the totality of circumstances test. 151 Hawai'i at 291, 511 P.3d at 390.

Ketchum stated a clear, easily applied, bright-line rule: when probable cause to arrest exists upon an initial stop or detention, the Hawai'i constitution requires that Miranda rights be given before "interrogation" occurs. Ketchum, 97 Hawai'i at 126, 34 P.3d 1006 at 1025. Even before Ketchum, we had held that "if the detained person's responses to a police officer's questions provide the officer with probable cause to arrest . . . the officer is—-at that time—-required to inform the detained person of his or her constitutional rights against self-incrimination and to counsel, as mandated by Miranda and its progeny." State v. Loo, 94 Hawai'i 207, 212, 10 P.3d 728, 733 (2000) (citing State v. Melemai, 64 Haw. 479, 481-82, 643 P.2d 541, 543-44 (1982)). Ketchum followed within a year, setting out the rule quoted above pursuant to article I, section 10 of the Hawai'i constitution. 97 Hawai'i at 126, 34 P.3d 1006 at 1025.

Bright-line rules foster uniformity and predictability. See Antonin Scalia, The Rule of Law as a Law of Rules, 56 U. Chi. L. Rev. 1175, 1179 (1989). The most significant role of judges may be to protect the individual criminal defendant

22

against the occasional excesses of popular will, and to preserve the checks and balances within our constitutional system that are designed to inhibit that popular will.  Id., 56 U. Chi. L. Rev. at 1180.  In terms of constitutional rules of criminal procedure, in order to preserve checks and balances, bright-line rules are therefore preferable.[15]

---

[15]    As Justice Scalia stated:

> I had always thought that the common-law ["totality of circumstances"] approach had at least one thing to be said for it: it was the course of judicial restraint, "making" as little law as possible in order to decide the case at hand.  I have come to doubt whether that is true. For when, in writing for the majority of the Court, I adopt a general rule, and say, "This is the basis of our decision," I not only constrain lower courts, I constrain myself as well.  If the next case should have such different facts that my political or policy preferences regarding the outcome are quite the opposite, I will be unable to indulge those preferences; I have committed myself to the governing principle. In the real world of appellate judging, it displays more judicial restraint to adopt such a course than to announce that, "on balance," we think the law was violated here—leaving ourselves free to say in the next case that, "on balance," it was not.  It is a commonplace that the one effective check upon arbitrary judges is criticism by the bar and the academy.  But it is no more possible to demonstrate the inconsistency of two opinions based upon a "totality of the circumstances" test than it is to demonstrate the inconsistency of two jury verdicts.  Only by announcing rules do we hedge ourselves in.
> While announcing a firm rule of decision can thus inhibit courts, strangely enough it can embolden them as well.  Judges are sometimes called upon to be courageous, because they must sometimes stand up to what is generally supreme in a democracy: the popular will.  Their most significant roles, in our system, are to protect the individual criminal defendant against the occasional excesses of that popular will, and to preserve the checks and balances within our constitutional system that are precisely designed to inhibit swift and complete accomplishment of that popular will.  Those are tasks which, properly performed, may earn widespread respect and admiration in the long run, but—almost by definition—never in the particular case.  The chances that frail men and women will stand up to their unpleasant duty are greatly

Determining whether a defendant is in custody under a totality of circumstances requires consideration of many factors other than the existence of probable cause.  In Sagapolutele-Silva, however, the majority eliminated the bright-line "probable cause" test for custody and required analyzing "custody" based on multiple factors.  151 Hawaiʻi at 292, 511 P.3d at 791.

Also, until Sagapolutele-Silva, this court had "consistently provided criminal defendants with greater protection under Hawaiʻi's version of the privilege against self-incrimination (article I, section 10 of the Hawaiʻi Constitution) than is otherwise ensured by the federal courts under Miranda and its progeny."  State v. Valera, 74 Haw. 424, 434, 848 P.2d 376, 380 (1993).  The majority in Sagapolutele-Silva actually attempted to retrench on Hawaiʻi constitutional rights.  The Ketchum bright-line rule enhances protection of our citizens' constitutional rights and equal treatment of people under the law.

---

increased if they can stand behind the solid shield of a firm, clear principle enunciated in earlier cases.  It is very difficult to say that a particular convicted felon who is the object of widespread hatred must go free because, on balance, we think that excluding the defense attorney from the line-up process in this case may have prevented a fair trial.  It is easier to say that our cases plainly hold that, absent exigent circumstances, such exclusion is a per se denial of due process.

56 U. Chi. L. Rev. at 1179-80.

We therefore expressly overrule Sagapolutele-Silva's abrogation of Ketchum's bright-line rule and, based on the above, hold that the Ketchum rule remains in effect:  Miranda warnings are required by article I, section 10 of the Constitution of the State of Hawaiʻi when probable cause to arrest has developed.  Ketchum, 97 Hawaiʻi at 126, 34 P.3d at 1025.

Hence, at the point probable cause to arrest Hewitt had developed, which was at least by the time officers learned the truck owned by "Cyrus Hewitt" crashed on the roadside contained Hewitt's identification card, she was entitled to Miranda warnings before questioning recommenced.  For the reasons discussed below, however, Hewitt was in custody under a totality of circumstances and entitled to Miranda warnings even before that point in time.

3.  **Based on the totality of circumstances, Hewitt was already in custody even before probable cause developed**

The ICA ruled that Hewitt was not in custody at the time she made her statement about having driven the truck because (1) her inability to leave was not the result of detention by law enforcement; (2) the officers did not have probable cause to arrest Hewitt until she stated she had been driving the truck; and (3) the record does not reflect any sustained and coercive

25

questioning of Hewitt by the officers. Hewitt, 149 Hawaiʻi at 75, 481 P.3d at 717.

When a bright-line rule regarding "custody" (such as the existence of probable cause) has yet to be triggered, "[w]hether the defendant was in custody or otherwise deprived of [their] freedom of action for Miranda purposes is to be determined from the totality of the circumstances, objectively appraised." Patterson, 59 Haw. at 361, 581 P.2d at 755. "These [circumstances] would include the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances." Id.

Thus, the circumstance of a person being questioned while in a hospital bed or receiving medical treatment is relevant to the "totality of circumstances" analysis. Other courts have specifically addressed questioning by law enforcement of a person in a hospital bed or receiving medical treatment. The First Circuit has stated that "[w]hen an individual is unable to 'leave' the place of the interrogation solely due to circumstances incident to medical treatment, the question is said to be slightly different: whether [they were] at liberty to terminate the interrogation and 'cause the [officers] to

26

leave.'" Infante, 701 F.3d at 396, modified on other grounds by

Hill v. Walsh, 884 F.3d 16 (1st Cir. 2018).[16]

---

[16] Other courts have articulated different tests regarding whether custody is established when a person is unable to leave the hospital due to their medical condition. See State v. Pontbriand, 878 A.2d 227, 231-32 (Vt. 2005). The United States Court of Appeals for the Fourth Circuit adopted a "reasonably free to terminate questioning and leave" test:

> The question of custody typically turns on whether "a reasonable person [would] have felt [they were] not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). In some circumstances, however, the defendant may be prevented from pretermitting the interrogation because of factors independent of police restraint. For example, in Florida v. Bostick, the defendant's "freedom of movement was restricted by a factor independent of police conduct—i.e., by his being a passenger on a bus"—which rendered the standard "free to leave" analysis inapplicable. 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (emphasis omitted). In such circumstances, "the appropriate inquiry is whether a reasonable person would feel free to decline officers' requests or otherwise terminate the encounter." Id. at 436, 111 S.Ct. 2382.
> This court came to a similar conclusion in United States v. Conley, 779 F.2d 970 (4th Cir. 1985), a case decided before Bostick. . . .
>       . . . .
> Analysis of whether Jamison was in custody when he made the statements describing the shooting depends on "whether a reasonable person would [have] fe[lt] free to decline the officers' requests or otherwise terminate the encounter," Bostick, 501 U.S. at 436, 111 S.Ct. 2382. In dissecting the perceptions of such a reasonable person, however, we must be careful to separate the restrictions on his freedom arising from police interrogation and those incident to his background circumstances. That is, to the extent Jamison felt constrained by his injuries, the medical exigencies they created (e.g., the donning of a hospital gown and the insertion of an I.V. line), or the routine police investigation they initiated, such limitations on his freedom should not factor into our reasonable-person analysis. It is this careful differentiation between police-imposed restraint and circumstantial restraint that leads us to conclude that Jamison was not in custody when he described the shooting during his hospital interview. The district court properly invoked the same lodestar, but proceeded to classify the significant limitations on Jamison's freedom as police-imposed when they were actually routine treatment for a person in Jamison's position.

27

We generally adopt the First Circuit's approach for purposes of the article I, section 10 right against self-incrimination.  We hold that, under the Hawaiʻi Constitution, if a person is unable to leave a place of interrogation due to circumstances incident to medical treatment, determining whether the person is "in custody" under a totality of circumstances requires an inquiry into whether the person was at liberty to terminate the interrogation and cause the officer(s) to leave.

Applying that inquiry here, at the time of the questioning, Hewitt lay in a hospital bed with contusions on her face, eyes swollen shut, a laceration on her ear, and a broken breast plate.  Early in the officers' encounter with Hewitt, Officer Nacino served her with a "legal document" and told her that she needed to sign the document.  The officers proceeded to question Hewitt about her injuries.  She did not know where she was or why she was there.

Both officers stood at her bedside throughout the interview, which started around one o'clock in the morning and continued intermittently until about three hours later.

---

United States v. Jamison, 509 F.3d 623, 629 (4th Cir. 2007) (alterations in original).

We disagree with the Fourth Circuit that limitations on a person's freedom due to background medical treatment circumstances should not factor into the custody analysis.  Such circumstances are relevant to the determination of whether a person is at liberty to terminate the interrogation and cause the officers to leave.

Hewitt's responses were largely incoherent. The officers had to continually wake her up throughout the interview because she had been heavily sedated. When Hewitt finally left the hospital, she could not do so on her own, and her friend had to assist her movements. Hewitt was not at liberty to terminate the interrogation and cause the officers to leave.

Applying other factors relevant to the "totality of circumstances" analysis, Hewitt had also become the focus of an OVUII investigation before Officer Nacino asked whether she had been driving. See Patterson, 59 Haw. at 361, 581 P.2d at 755 (holding that the focus of the investigation upon the defendant is an important factor in the determination of whether the defendant was subjected to custodial interrogation). In this regard, at the start of the officers' shift and before they even went to the hospital, HCPD received a report that somebody heard a traffic collision. The officers suspected Hewitt was under the influence of alcohol or another intoxicant. While Officer Nacino questioned Hewitt, HFD paramedics informed the officers of a truck apparently involved in a traffic collision and suggested that Hewitt was somehow connected. When the officers called Sergeant Rose to confirm the truck's whereabouts, they already doubted that Hewitt's injuries were from an assault as they told Sergeant Rose that "a person was at the hospital for injuries, which they didn't know if it was from an assault or

29

from a traffic accident" and "received information that there was a possible crash."[17]

Hence, under the totality of circumstances, Hewitt was in custody and entitled to Miranda warnings well before the officers asked her whether she had been driving the truck. The district court and ICA erred in holding that Miranda warnings were not required until after she responded to the question.

## V. Conclusion

Hewitt's conviction has already been set aside and the charges against her have been dismissed. It is therefore unnecessary to determine when custodial interrogation of Hewitt actually commenced. A remand is no longer appropriate, whether on the bases previously ordered by the ICA or to address the issues discussed in this opinion.

---

[17] Sergeant Rose confirmed the truck's location in some brush and its damaged state, which provided an explanation for Hewitt's injuries and why she had dirt and leaves on her person—details Officer Sugata testified to noticing about Hewitt's appearance. Sergeant Rose also found Hewitt's identification card in the truck, and texted a photo of the card to Officer Nacino. Except for her injuries, Hewitt matched the image of the person on the card. A search of the truck's license plate number revealed that it was registered to a "Cyrus Hewitt," whom the officers assumed was Hewitt's father.

Due to the procedural posture of this case, we therefore instead reverse the ICA's March 20, 2021 Judgment on Appeal that ordered a remand and affirm the district court's August 9, 2021 judgment of nolle prosequi of both counts.

Taryn R. Tomasa
for petitioner

Christopher K. Rothfus
for respondent

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Todd W. Eddins

